643 F.2d 542
 IOWA PUBLIC SERVICE COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Burlington Northern, Inc. ("BN") and Chicago and North
Western Transportation Co. ("CNW"),
Intervenor-Respondents.
BURLINGTON NORTHERN, INC., et al., Petitioners,
v.
The UNITED STATES of America and Interstate Commerce
Commission, Respondents.
Iowa Public Service Company, Intervenor.
BURLINGTON NORTHERN, INC., et al., Petitioners,
v.
The UNITED STATES of America and Interstate Commerce
Commission, Respondents.
Iowa Power & Light Company et al., Intervenors.
 Nos. 79-1550, 79-1748 and 79-1749.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1980.
Decided March 16, 1981.
Rehearing Denied April 14, 1981.
 
 Kathleen M. Dollar, Deputy Associate Gen. Counsel, I.C.C., Washington, D. C., for I. C. C.
 R. Eden Martin, Washington, D. C., for Burlington Northern.
 John M. Cleary, Washington, D. C., for Iowa Public Service.
 John J. Powers, III, Attorney, Dept. of Justice, Washington, D. C., for United States.
 Before LAY, Chief Judge, and ROSS and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 Burlington Northern, Inc. (BN), Chicago and North Western Transportation Co. (CNW), and Iowa Public Service Company (IPS) petition for review of an order of the Interstate Commerce Commission (ICC or Commission) served July 13, 1979,[1] which prescribed maximum reasonable rates for unit-train shipments of coal from the Powder River Basin in Wyoming to Sergeant Bluff, Iowa.[2]
 
 
 2
 IPS operates a coal-fired electricity generating facility at Sergeant Bluff, Iowa, consisting of four generating units (Neal Units 1, 2, 3 and 4). For several years, the Union Pacific Railroad has moved coal for Neal Units 1, 2 and 3 from origin mines in southern Wyoming to Council Bluffs, Iowa, and the CNW has moved the coal beyond to Sergeant Bluff. In 1973 planning began for construction of Neal Unit 4. On September 29, 1977 IPS executed a coal purchase agreement with Carter Oil Company to supply Neal Unit 4 with coal from a different source; namely, Carter's mines near Gillette, Wyoming.[3] IPS and BN were unsuccessful at efforts to agree upon a carriage rate for the movement of Carter coal to Sergeant Bluff, and, subsequently, BN published a rate of $10.69 per net ton, effective September 15, 1978. IPS protested the rate, and the Commission instituted an investigation that resulted in its order of July 13, 1979. The Commission's decision and order of July 13, 1979 found that the BN and CNW joint rate of $10.69 per net ton was unlawfully high, that a maximum reasonable rate should not exceed $8.23 per net ton, and that IPS was entitled to a refund measured by the difference between the maximum reasonable rate level and the rate which had been charged. On review, objections are raised to the Commission's (I) finding of market dominance, (II) cost determinations, (III) use of a seven per cent additive above fully allocated costs, (IV) alleged failure to consider the energy implications of its regulatory action, and (V) authority to award refunds in this case.
 
 
 3
 I. Market Dominance.
 
 
 4
 Under the Railroad Revitalization and Regulatory Reform Act of 1976, or 4-R Act, P.L. 94-210, 90 Stat. 31, the Commission may not suspend a rate increase as being in excess of a reasonable maximum unless that carrier has market dominance over the transportation to which the rate applies.[4] 49 U.S.C. § 10709.
 
 
 5
 The railroads allege that the Commission erred in concluding that BN and CNW have market dominance over coal movements from the Carter Oil Company mines in northern Wyoming to Sergeant Bluff, Iowa.
 
 
 6
 We disagree.
 
 
 7
 The railroads' argument turns on geographic competition,[5] that is, the supposed availability of southern Wyoming coal supplies for IPS's Neal Unit 4. The argument that geographic competition exists is convincingly rebutted by evidence in the record[6] showing that IPS is committed to northern Wyoming coal reserves and that southern Wyoming coal reserves may be insufficient to supply Neal Unit 4.
 
 
 8
 In June 1978, when the challenged $10.69 rate was proposed, IPS was committed for three years to purchase coal for Neal Unit 4 from Carter Oil Company's Rawhide and Caballo mines near Gillette, Wyoming. Later in 1978 further commitments to the northern Wyoming source of supply for a period of five years were made. Since no other rail lines serve these Carter mines, the Commission reasonably concluded that IPS is a captive shipper at least for the immediate future.
 
 
 9
 This conclusion is unaffected by evidence showing that IPS may wish to switch to coal supplies from its energy subsidiary, Rocky Mountain Energy Corporation. Although the Rocky Mountain group actively bid for the Neal Unit 4 supply contract, the company was apparently unable to secure sufficient uncommitted reserves to meet Unit 4's projected needs. Testimony of IPS's fuel supply manager before the Commission confirms the uncertainty regarding the sufficiency of southern Wyoming reserves.
 
 
 10
 Given this evidence and testimony, the Commission's finding of market dominance is reasonably supported by substantial evidence and is not arbitrary and capricious. While geographic competition may be relevant in certain contexts to rebut a showing of market dominance, it is of less importance where the availability of other coal sources has not been established.
 
 
 11
 We reach the issue of geographic competition aware of possible inconsistency on the part of the Commission as to whether geographic competition may be considered in determining market dominance. See Ex Parte No. 320, Special Procedures for Making Findings of Market Dominance, Interim Report, 353 ICC 735, 904-05 (1976); cf. Ex Parte No. 320, Special Procedures for Making Findings of Market Dominance, Clarification of Prior Decisions, 359 ICC 735, 735 n.2, 736 n.7 (1979). See also Central Power & Light Co. v. United States, 634 F.2d 137, 172-175 (5th Cir. 1980) (remanding for clarification of whether the language or history of § 10709 permits consideration of geographic competition).
 
 
 12
 Should the Commission finally determine that geographic competition is not relevant to market dominance, our affirmance of the Commission's finding, of course, would be unchanged. The railroads have offered no convincing argument against market dominance other than that based on geographic competition.[7]
 
 
 13
 II. Cost Determinations.
 
 
 14
 Courts traditionally have applied a deferential standard in reviewing rate determinations by an agency, Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade, 412 U.S. 800, 806, 93 S.Ct. 2367, 2374, 27 L.Ed.2d 350 (1973), but the courts have an obligation to determine whether the Commission's decision comports with applicable law, whether there is evidence in the record to support the Commission's findings, and whether the agency's rationale is both discernible and defensible. San Antonio, Texas v. United States, 631 F.2d 831, 836 (D.C.Cir.1980); Burlington Northern, Inc. v. United States, 549 F.2d 83, 88-89 (8th Cir. 1977). Our analysis of the cost issues tracks closely the well-reasoned analysis of similar issues by the District of Columbia Circuit in San Antonio, Texas v. United States, 631 F.2d at 837-53, and the Fifth Circuit in Celanese Chemical Co. v. United States, 632 F.2d 568, 572-78 (5th Cir. 1980). Our analysis is also influenced by the Commission's reconsideration of some of these issues in Unit Train Rates on Coal Burlington Northern, Inc., I.& S. No. 9199 (served October 1, 1980). We believe it is necessary to remand certain of these cost issues to the Commission so that uniform policies can be developed and applied.
 
 
 15
 A. Fixed Plant Investment Additive.
 
 
 16
 IPS argues that the Commission's use of both a fixed plant investment additive and Rail Form A in computing the maximum reasonable rate for this transportation double-counted the cost of certain items such as rails, ties, ballast, shops, engine houses and other fixed plant investments. In Unit Train Rates on Coal Burlington Northern, Inc., I.&S. No. 9199 (served October 1, 1980), the Commission admitted that the use of the additive and Rail Form A double-counted these costs. Id., slip op. at Appendix A, 8-9. The District of Columbia Circuit also noted the double counting error in San Antonio, 631 F.2d at 841-44. We remand for reconsideration of this issue in light of these decisions.
 
 
 17
 B. Deferred Tax Account.
 
 
 18
 IPS next argues the Commission's treatment of federal taxes resulted in overestimation of the rate base.[8] IPS argues that the Commission neglected to deduct the deferred tax account from the net investment base prior to calculating the rate to be assessed, contrary to the policy expressed in Ex Parte No. 338, 358 I.C.C. 844, aff'd as modified, 359 I.C.C. 270 (1978). The Commission admitted its error in I.&S. No. 9199 (served October 1, 1980) ("Once the decision to normalize taxes is made, however, deferred taxes should be deducted from the net investment base prior to the calculation of any overall cost of capital." Slip op. at Appendix A, 10). Accord San Antonio, 631 F.2d at 847. We remand to the Commission for reconsideration of this treatment of the deferred tax account.
 
 
 19
 C. Statutory Tax Rate.
 
 
 20
 IPS also argues that the Commission's decision to adopt the statutory tax rate in railroad ratemaking proceedings is not appropriate in this case because there is no evidence to support the Commission's findings that the sum of actual income taxes, deferred taxes, and the investment tax credit approximates the statutory tax rate. The Commission's decision to use the statutory tax rate was based in part on its policy to assure that accelerated depreciation and the investment tax credit remain an incentive to capital spending. Ex Parte No. 338, 358 I.C.C. at 893-94. Accord San Antonio, 631 F.2d at 847. Because the use of the statutory tax rate is consonant with previous Commission policy, has found judicial support, see San Antonio, 631 F.2d at 846-47, and is a reasonable substitute for computation of actual taxes, we will not second-guess the Commission's approach in this regard.
 
 
 21
 D. Allocation of Fixed Costs.
 
 
 22
 The railroads argue that the inconsistent use of the ratio and ton-ton/mile methods of allocating fixed costs will result in a revenue shortfall for the railroads. In San Antonio, the D.C. Circuit found that the use of the ratio method of allocating fixed costs in coal cases was reasonable and consonant with the general course of Commission practice in Western coal cases. We agree with the D.C. Circuit's reasoning. San Antonio, 631 F.2d at 841 & nn.48-49.
 
 
 23
 E. Cost of Locomotive Investment.
 
 
 24
 The railroads argue that the Commission should have computed the rate base for this transportation on the basis of the full cost of new power units that had to be acquired because of the Sergeant Bluff movement, rather than the average cost of the locomotives in the pool of diesels that serves this movement. This argument was rejected by the D.C. Circuit in San Antonio, 631 F.2d at 838, and for the reasons stated therein we reject the railroads' argument.
 
 
 25
 F. Return on Locomotive and Caboose Investment.
 
 
 26
 The railroads next argue that the rate of return figured on locomotive investment should have taken into account the railroads' need to raise equity capital as provided for by the ratemaking provisions of the 4-R Act. 49 U.S.C. § 10704(a)(2). The Commission applied a 9.34% cost of capital rate to locomotives and cabooses, representing the interest rate of the railroads' current trust certificates. The railroads argue that the cost of capital in railroad equipment is the overall cost of capital rate of the railroad, including equity and debt, and not the particular financing rate of debt instruments that use the equipment as collateral. The railroads would apply to this equipment the same cost of capital as that applied to other investments, here 10.6%.
 
 
 27
 The Commission reasoned that the 10.6% rate of return needed on general corporate funds was inapplicable because locomotive and caboose equipment is not purchased with general corporate funds. Evidence in the record shows that all of the locomotives in the pool acquired by BN in 1977 and 1978 were obtained by leasing. The railroads did not rebut this evidence of large-scale leasing. Accordingly, the Commission with reason declined to accept a cost of capital not necessarily incurred, applying instead a "rental payment" costing methodology to this equipment.[9] We note also that the cost of capital determinations now challenged by the railroads were presented to the Commission by the railroads as an alternative.
 
 
 28
 In sum, the Commission's treatment of locomotive capital costs withstands the arbitrary and capricious standard of review which applies to its ratemaking. Burlington Northern, Inc. v. United States, 555 F.2d at 640; see also Atchison, Topeka and Santa Fe Railway v. Wichita Board of Trade, 412 U.S. at 806, 93 S.Ct. at 2374 (plurality opinion); Arizona Grocery Co. v. Atchison, Topeka and Santa Fe Railway, 284 U.S. 370, 387-88, 52 S.Ct. 183, 185, 76 L.Ed. 348 (1932).
 
 
 29
 III. Seven Per Cent Additive.
 
 
 30
 The railroads and IPS, for different reasons, object to the Commission's use of a seven per cent increment above fully allocated costs in computing the maximum reasonable rate for the transportation with which we are concerned. The D.C. Circuit, San Antonio, 631 F.2d at 850-53, and the Fifth Circuit, Celanese Chemical Co. v. United States, 632 F.2d 568, 576-77 (5th Cir. 1980), have described in detail their reasons for rejecting such increments above fully allocated costs as arbitrary and capricious. Accord, Union Pacific R.R. v. United States, 637 F.2d 764 (10th Cir. 1981). This court, like the D.C., Fifth and Tenth Circuits, cannot properly assess the Commission's action when it supplies no reasoned analysis. On remand, the Commission is directed to explain more fully its reasons for selecting a particular increment, if any, above fully allocated costs, making sure that its decision is based on a thorough analysis of the relevant interests.
 
 
 31
 IV. Energy Implications.
 
 
 32
 The Justice Department argues that the Commission's decision does not adequately consider the impact of its regulatory actions on the national energy policy. We agree and remand this case so that the Commission can comply with the Energy Policy and Conservation Act, Pub.L.No.94-163, § 382, 42 U.S.C. § 6362, and the regulations implementing this statute. 49 CFR §§ 1106.1-1106.8. See Celanese Chemical, 632 F.2d at 579.
 
 
 33
 V. Commission's Power to Grant Refunds.
 
 
 34
 The railroads argue that the Commission's decision, served July 13, 1979, came too late to serve as a basis for awarding refunds to IPS. We disagree. BN's and CNW's $10.69 joint rate went into effect September 15, 1978. The ten month extended deadline for a decision on this rate, as provided by 49 U.S.C. § 10707(b)(1) expired no earlier than July 15, 1979; consequently the decision was timely. We express no opinion herein as to whether the Commission can grant refunds on the basis of decisions issued after the expiration of time periods provided in 49 U.S.C. § 10707(b)(1).
 
 
 35
 VI. Staggers Rail Act.
 
 
 36
 Pursuant to Fed.R.App.P. 28(j), the railroads have moved for leave to refer to additional authorities. The railroads wish to place before the court Section 202 of the Staggers Rail Act of 1980, Pub.L. 96-448, Oct. 14, 1980, 94 Stat. 1895, which they allege deprives the Commission, and hence the court, of jurisdiction over the Sergeant Bluff rate as of the date the Act was signed into law.
 
 
 37
 We acknowledge the principle that when a law conferring jurisdiction is repealed without reservation as to pending cases, all cases fall with the law. Bruner v. United States, 343 U.S. 112, 116-17, 72 S.Ct. 581, 584, 96 L.Ed. 786 (1952). The present appeal, however, does not necessarily fall within this principle. Exceptions to retroactive application of a statute have been recognized where only private rights, as opposed to great national concerns, are involved, United States v. Schooner Peggy, 1 Cranch 103, 110, 2 L.Ed. 49 (1801), or where retroactive application would result in manifest injustice. Bradley v. School Board of Richmond, 416 U.S. 696, 716, 94 S.Ct. 2006, 2018, 40 L.Ed.2d 476 (1974) (dictum); Thorpe v. Housing Authority of Durham, 393 U.S. 268, 282 n.43, 89 S.Ct. 518, 526 n.43, 21 L.Ed.2d 474 (1969) (dictum), citing Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964).
 
 
 38
 Assuming arguendo[10] that the revenue to cost percentage here is not sufficient to invoke the Commission's jurisdiction under the provisions of the Staggers Rail Act, this is a case in which manifest injustice precludes application of the Act.
 
 
 39
 The ninety day period statutorily allowed for the Commission's determination of jurisdiction is long past. See 49 U.S.C. § 10709(b).[11] All parties to this lengthy proceeding have looked to the Commission for an adjudication of their rights. Application of the Staggers Rail Act at this juncture could result in imposition of the $10.69 rate on IPS without an opportunity to be heard, in derogation of the parties' expectations. Bradley v. School Board of Richmond, 416 U.S. at 720, 94 S.Ct. at 2020.
 
 
 40
 For this reason, we deny the railroads' motion for leave to refer to additional authorities. We note also that as a general rule an agency is entitled to make the initial determination of its own jurisdiction. FPC v. Louisiana Power & Light Co., 406 U.S. 621, 647, 92 S.Ct. 1827, 1841, 32 L.Ed.2d 369 (1972).
 
 
 
 [1]
 IPS filed a petition for review of the July 13, 1979 order in this court (No. 79-1550); BN and CNW petitioned for review of the order of July 13, 1979 and the supplementary order of July 16 in the District of Columbia Circuit. By order filed August 30, 1979, the Court of Appeals for the District of Columbia Circuit transferred the railroad's review proceedings to this court
 
 
 [2]
 The decision and order served July 13, 1979 covered Unit-Train Rates on Coal Burlington Northern, Inc. (I&S Docket No. 9199), Iowa Power and Light Company v. Burlington Northern, Inc. (Docket No. 36944), Annual Volume Rates on Coal Rawhide Junction, Wyoming, to Sergeant Bluff, Iowa (Docket No. 37021), and Iowa Public Service Company v. Burlington Northern, Inc. and Chicago and North Western Transportation Company (Docket No. 37029)
 I&S No. 9199 and No. 36944 involved Burlington Northern's proposed rate for unit train movements of coal from Belle Ayr, Wyoming, to the Iowa Power & Light Company (IPL) generating station at Council Bluffs, Iowa. These two proceedings were remanded to the Commission by this court's order of May 7, 1980. The Commission served its further decision and order on October 1, 1980. The Commission's October 1, 1980 decision consolidated I&S Docket No. 9199 and Docket No. 36944 with Docket No. 37322, Coal, Belle Ayr and Eagle Junction, WY, to Council Bluffs, Iowa, and Docket No. 37354, Iowa Power and Light Company v. Burlington Northern, Inc. BN filed a petition for review of the October 1, 1980 decision which was heard by this court in December, 1980.
 The proceedings at issue here were commenced by IPS filing a petition for investigation (ICC Docket No. 37021) and complaint (ICC Docket No. 37029) seeking a lower rate on coal moved by BN from the Powder River Basin to BN's connection with CNW near Omaha, Nebraska, and then by CNW to IPS's electric generating station at Sergeant Bluff, Iowa. The United States and the Interstate Commerce Commission are respondents pursuant to 28 U.S.C. § 2322 and FRAP 15(a). This court has jurisdiction under 28 U.S.C. §§ 2321(a), 2342(5), and 2344, as amended by Public Law No. 93-584, 88 Stat. 1917.
 
 
 [3]
 The contract called for escalating purchases of coal beginning September 1, 1978 until August 31, 1983, leveling off at an annual rate, beginning in 1980, of approximately 2,000,000 tons. IPS had options to terminate the contract as early as September 1, 1981, and could extend the contract through August 31, 1998, subject to a series of additional options to terminate
 
 
 [4]
 Burlington Northern, Inc. v. United States, 555 F.2d 637, 640 (8th Cir. 1977), held that the Commission's duty under § 202(b) of the 4-R Act, 49 U.S.C. § 1(5)(a-d), to make a finding of market dominance over the service to be rendered did not apply to proceedings begun before passage of the 4-R Act. The investigation in this case (I.C.C. Docket No. 37021) began by order of the ICC dated September 12, 1978, served September 14, 1978. This investigation began before the passage of the Revised Interstate Commerce Act, P.L. 95-473, § 10701-11916, 49 U.S.C. § 10101-11916, 92 Stat. 1337-1470 (October 13, 1978). Thus, the duty of the Commission was to determine if the carrier had "market dominance over the service to be rendered," 4-R Act, § 202(b), 49 U.S.C. § 1(5)(b), rather than to determine if the carrier had "market dominance over the transportation to which the rate applies," Revised Interstate Commerce Act, § 10709, 49 U.S.C. § 10709, 92 Stat. 1382. Any difference in the language between the two phrases is not substantive, H.R.No.95-1395, 95th Cong., 2d Sess. 5, reprinted in (1978) U.S.Code Cong. & Ad.News 3009, 3013, because the 1978 revisions were made merely for clarity and consistency, id. at 79-80, (1978) U.S.Code Cong. & Ad.News at 3088-89. Consequently, focus by the Commission, Government, IPS and BN on the language of § 10709 is not inappropriate
 
 
 [5]
 Geographic competition is described by the Commission as "shipper use of alternate destinations or sources for the products to which the rate applies." Ex Parte No. 320, Special Procedures for Findings of Market Dominance, Interim Report, 353 ICC 874, 900 (1976)
 
 
 [6]
 We acknowledge difficulty in stating the standard of review which applies to the Commission's market dominance determination. The difficulty in specifying an appropriate standard of review derives from the unsettled nature of the market dominance showing
 Under the provisions of 49 U.S.C. § 10709(b), the Commission is required to make its market dominance determination within ninety days of the institution of a section 10707 proceeding. The Commission has taken the position that a relevant factor in defining the scope of the market dominance inquiry is the rapidity with which the Commission can determine the issue. Ex Parte No. 320, Special Procedures for Findings of Market Dominance, Interim Report, 353 ICC 874 (1976). In an extension of this reasoning, the Commission here argues that the ninety day deadline precludes a full evidentiary hearing on market dominance. Accordingly, the Commission contends, the market dominance determination is not an adjudication "on the record" to which the substantial evidence standard of review applies.
 Assuming arguendo that the allegedly narrower arbitrary and capricious standard applies, we find that the difference between the two standards is largely semantic in the context of the present record. See also Pacific Legal Foundation v. Department of Transportation, 593 F.2d 1338, 1343 n.35 (D.C.Cir.), cert. denied, 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979); Associated Industries of New York State, Inc. v. Department of Labor, 487 F.2d 342, 349-50 (2d Cir. 1973). See also National Nutritional Foods Association v. Weinberger, 512 F.2d 688, 705 (2d Cir. 1975) (Lumbard, J., concurring in the result); K. Davis, Administrative Law Treatise § 29.01-2 at 284, 285 (1980 Supp.); Note, Judicial Review of Facts in Informal Rulemaking: A Proposed Standard, 84 Yale L.J. 1750 (1975).
 
 
 [7]
 Our disposition does not require us to address one of the Commission's alternative grounds for finding market dominance, namely, a revenue-to- variable-cost ratio of 236% for the Sergeant Bluff traffic. See 49 CFR § 1109.1(g)(2) (ratio of 160% triggers a rebuttable presumption of market dominance). Because we vacate some of the Commission's cost determinations, we are unable to determine whether BN's market dominance over this transportation could be supported by an analysis of the ratio of revenue to variable costs
 
 
 [8]
 The Commission computed the cost of service as if the carriers were using a straight-line method of depreciation even though the carriers actually are using an accelerated depreciation schedule. Under this method (normalization) the railroads receive the benefit of a tax deferral and the advantage of charging rates as if the higher tax rate had been paid
 
 
 [9]
 At the revenue need level, the Commission restated an after-tax cost of capital rate of 9.64% for locomotives and cabooses. The 9.64% figure represents a combined use cost (depreciation with an overhead factor) and interest cost (at the current equipment trust certificate rate). It approximates a "rental payment" as a basis for return on this equipment investment
 
 
 [10]
 Because we remand several cost issues to the Commission, it is not possible to determine whether the revenue-to-variable-cost percentage here is so low as to result in a loss of jurisdiction under Section 202 of the Staggers Rail Act (to be codified at 49 U.S.C. § 10709(d)(2))
 
 
 [11]
 Division 1 of the Commission found that the railroads have market dominance on December 6, 1978. The Commission affirmed this finding on petition for reconsideration in its July 13, 1979 decision
 The Staggers Rail Act of 1980 was signed into law on October 14, 1980. Section 710(a) provides that the relevant jurisdictional criteria shall take effect on October 1, 1980.