**The HANNA MINING COMPANY, a Delaware Corporation, Plaintiff-Appellant,**

v.

**The ESCANABA AND LAKE SUPERIOR RAILROAD COMPANY, a Michigan Corporation, Defendant-Appellee.**

No. 80–1681.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1981.

Decided Nov. 20, 1981.

Rehearing and Rehearing En Banc Denied March 8, 1982.

John K. Maser, III, Nicholas J. DiMichael, Donelan, Cleary, Wood & Maser, Washington, D. C., Michael B. Staebler, David K. McDonnell, Barris, Sott, Denn & Driker, Detroit, Mich., for plaintiff-appellant.

John H. Spellman, Hamel, Park, McCabe & Saunders, John Caldwell, Denise M. O'Brien, Washington, D. C., for defendant-appellee.

Before ENGEL and JONES, Circuit Judges and BERTELSMAN,* District Judge.

ENGEL, Circuit Judge.

The underlying issue in this appeal is the extent to which, if any, rate-setting agreements between a carrier and a shipper, entered into prior to October 1, 1980, are to be enforced in either state or federal court. Resolving this question requires this court to discuss the jurisdiction and authority of the Interstate Commerce Commission and the courts, both before and after the enactment of the Staggers Rail Act of 1980, Pub.L.No. 96–448, 94 Stat. 1895. 49 U.S. C.A. § 10101 *et seq.* (1981 pamphlet), in the field of regulating railroad freight rates.

Hanna Mining Company (Hanna) appeals from a judgment of the district court, 498 F.Supp. 1267, denying a preliminary injunction and dismissing its complaint for declar-

---

* Hon. William O. Bertelsman, Judge, United States District Court for the Eastern District of Kentucky, sitting by designation.

atory and injunctive relief against the Escanaba and Lake Superior Railroad Company (E & LS). That complaint sought to enjoin E & LS from charging certain tariffs which were greater than those agreed upon by Hanna and E & LS's predecessors in interest.

In 1968, Hanna was planning to build its own transportation facilities to ship increased ore production from its Groveland mine in Randville, Michigan, to Escanaba, Michigan, a total of 66.2 miles. The two railroads over which Hanna had previously been shipping its iron ore, the "Milwaukee Road" and the Chicago and Northwestern Transportation Company (CNW) offered Hanna a joint rate of $0.95 per ton. Hanna claims this offer induced it to abandon plans to build separate transportation facilities. A contract was concluded between Hanna and the two railroads, setting the base rate of $0.95 per ton, subject to a built-in escalation formula for future rate increases. Provisions of the contract purported to make it binding upon the successors and assignees of the original parties.

On March 8, 1980, E & LS purchased the "Milwaukee Road" segment of the joint haul, pursuant to the authority of the Milwaukee Road Restructuring Act, Pub.L.No. 96–101, 93 Stat. 736, 45 U.S.C. § 901 et seq. (1979 Supp. III). E & LS represented to the ICC, in seeking approval of the purchase, that it had "every intention of fulfilling its obligations to the Hanna Mining Company" under the existing contract. Nevertheless, on August 13, 1980, E & LS proposed a new tariff that effectively increased the rate above and beyond the level established by the contract. As found by the trial judge, the result of this action was to cancel E & LS's participation with CNW in the then-escalated joint rate of $1.80 per ton, and to establish a new rate of $.90 per ton applicable to the 12.2 mile segment from Randville to Iron Mountain, Michigan.

While the parties are not in agreement as to the effect of E & LS's action on the total freight charge for the entire 66.2 mile line-haul, it is obvious that under either party's calculation, the total freight charge would exceed that specified in the contract. On September 3, 1980, Hanna filed a protest with the ICC and asked for a suspension of the proposed tariffs as being in contravention of the 1968 agreement to which, it claimed, E & LS was bound. On September 17, 1980, the ICC declined to suspend the rates or to prevent them from becoming effective, but ordered an investigation to determine, among other things, whether a contract existed and the effect of the alleged contract on the rate level. On the same day Hanna filed its complaint in federal district court seeking a declaratory judgment that the 1968 agreement was binding upon E & LS, as well as interlocutory and permanent injunctive relief to prevent E & LS from charging any other rate than that specified in the 1968 agreement.

After having originally issued a temporary restraining order, United States District Judge Philip Pratt, in a memorandum opinion filed on October 1, 1980, concluded that under the then existing law, the district court was without jurisdiction to enjoin any alleged breach of the contract, either permanently or temporarily, pending the ICC investigation. The court reasoned that judicial intervention was precluded by the primary jurisdiction vested by Congress in the ICC to determine the lawfulness and reasonableness of railroad rates under relevant portions of the Interstate Commerce Act. Because the ICC had the power to suspend or withhold suspending the proposed date pending an investigation, 49 U.S.C. § 10707, Judge Pratt concluded that any district court injunctive action to suspend the rate was foreclosed because the ICC had already exercised its authority under the statute not to suspend the rate. Judge Pratt based his decision primarily upon *Arrow Transportation Co. v. Southern Railway Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); and *Southern Railway Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979). The trial court relied especially upon the language in *Southern Railway, supra*, that it was "absolutely clear" that Congress intended to commit the rate suspension power to the "unfettered discretion" of the ICC. *Id.*, at 460 n.14, 99 S.Ct. at 2397 n.14.

Hanna has relied, before the district court and here, upon *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796 (8th Cir. 1980), and *Southwestern Electric Power Co. v. Burlington Northern*, 475 F.Supp. 510 (E.D.Tex 1979) (SWEPCO), as authority that a railroad may be injunctively compelled to abide by a contractual freight rate, at least until such time as the ICC determines that the contract rate has become unlawful or no longer falls within the zone of reasonableness. In declining to follow those cases, Judge Pratt noted that in both *Iowa Power* and *SWEPCO*, the ICC had expressly declined to consider the force and effect of the parties' pre-existing agreement in making its reasonableness determination, declaring that this was a matter for the courts to decide. Therefore, in accepting jurisdiction, the courts in *Iowa Power* and *SWEPCO* appeared to be carrying out the ICC's wishes by exercising the power which the ICC itself did not possess or was at least unwilling to exercise—that is, the power to enforce the rate agreements.

In contrast, the district court in this case observed that the ICC had agreed to consider, in making its reasonableness determination, Hanna's allegation that the proposed rate change was in excess of the contract between itself and the carriers; moreover, the ICC had expressed its willingness to "suspend the rate change and/or ultimately to find that the rate is unreasonable and unlawful and to prescribe a rate that conforms to the contract." ICC Ex parte, No. 358–F "Change of Policy, Railroad Contract Rates" (February 21, 1980). The ICC apparently based this new policy on its understanding that "it is ... well established that a court has no power to suspend or enjoin the effectiveness of a rate on file with the Commission." ICC Ex parte No. 358–F, *supra*. Therefore, Judge Pratt concluded that since the ICC had specifically agreed to consider Hanna's contractually-based allegations when reviewing the reasonableness of the E & LS proposed

rate, there was no basis, even under *SWEPCO* and *Iowa Power*, for the court to exercise jurisdiction.

## I.

▮ Whatever might be the merits of the logic and analysis of *SWEPCO*, we agree with Judge Pratt that any power in the district court to enter a preliminary injunction in connection with a contract adjudication must yield to the ICC's exercise of power to determine the reasonableness of rates and specifically to determine whether to suspend those rates pending an investigation and a final decision. Historically, the tariff rate structure itself has been the very heart of the regulatory powers conferred by Congress upon the ICC. It is apparent to us, as it was to the district court, that the Interstate Commerce Act did not confer upon the courts any part of the ICC's regulatory jurisdiction.[1] We agree with the district court's interpretation of *Arrow Transportation, SCRAP* and *Southern Railway, supra*, and conclude that the trial judge properly decided the case under the law as it existed up to the date the judgment was entered, October 1, 1980. What he could not know was that two weeks later, on October 14, the President would sign into law the Staggers Rail Act of 1980, which by its express terms was made effective as of October 1, 1980, the very day of the district court's decision. Our attention now turns to the effect upon the district court's decision of the enactment of this new statute.

## II.

▮ The Staggers Rail Act of 1980 represents a significant change in policy with respect to the regulation of the nation's railroad system. The developing financial instability of that system had been recognized earlier by the Regional Rail Reorganization Act of 1973, Pub.L. No. 93–236, 87 Stat. 985, under which the Congress endeavored to stave off the threatened bankruptcy of the Penn Central and other rail-

---

1. Interestingly, in *SWEPCO*, the court purported to find its jurisdictional basis in the Declaratory Judgment Act, 28 U.S.C. § 2201 (1976). That Act, of course, merely provides for the remedy of declaratory relief in cases in which jurisdiction already exists. That statute does not itself create jurisdiction.

roads in the northeastern United States, and the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, under which Congress sought to ensure that railroads would receive adequate revenues and returns on capital. The Staggers Rail Act attempts a more long-range solution to the ills of the railway system by eliminating what Congress deemed to be unnecessary and inefficient government regulation. The findings and goals of this new statute are expressed in sections 2 and 3.[2]

It is apparent from a reading of the Staggers Rail Act that it represents a major effort to reduce the authority of the Interstate Commerce Commission to set maximum reasonable rates in those situations where natural market forces are better able to determine the price of rail transportation. At the same time, the Act maintains a limited authority in the Interstate Commerce Commission to set reasonable rates for railroads acting as common carriers where competition is nonexistent, and to ensure that rail carriers are able to earn revenues adequate to revitalize the industry.[3]

Two provisions of the Staggers Rail Act are particularly important to our decision here. Section 202 of the Act, 49 U.S.C.A. § 10709, establishes minimum thresholds for ICC jurisdiction to make a "market dominance" determination. Such a determination is a prerequisite for an ICC investigation into the reasonableness of rates. *See* 49 U.S.C.A. § 10709 (1979 Supp. III). Thus, until September 30, 1981, the ICC cannot investigate or determine the reasonableness of any proposed rail rate which results in a revenue-to-variable cost percentage of less than 160%.[4]

Section 208, 49 U.S.C.A. § 10713, authorizes rail carriers and shippers to contract privately and to establish their own rates. Any such contract, however, must be filed with the ICC where it can be reviewed, but only to determine (1) in the case of rail transportation of non-agricultural commodities, whether the contract unduly impairs

**2.** SEC. 2. The Congress hereby finds that—

(1) historically, railroads were the essential factor in the national transportation system;

(2) the enactment of the Interstate Commerce Act was essential to prevent an abuse of monopoly power by railroads and to establish and maintain a national railroad network;

(3) today, most transportation within the United States is competitive;

(4) many of the Government regulations affecting railroads have become unnecessary and inefficient;

(5) nearly two-thirds of the Nation's intercity freight is transported by modes of transportation other than railroads;

(6) earnings by the railroad industry are the lowest of any transportation made and are insufficient to generate funds for necessary capital improvements;

(7) by 1985, there will be a capital shortfall within the railroad industry of between $16,-000,000,000 and $20,000,000,000;

(8) failure to achieve increased earnings within the railroad industry will result in either further deterioration of the rail system or the necessity for additional Federal subsidy; and

(9) modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation.

GOALS

SEC. 3. The purpose of this Act is to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States. In order to achieve this purpose, it is hereby declared that the goals of this Act are—

(1) to assist the railroads of the Nation in rehabilitating the rail system in order to meet the demands of interstate commerce and the national defense;

(2) to reform Federal regulatory policy so as to preserve a safe, adequate, economical, efficient, and financially stable rail system;

(3) to assist the rail system to remain viable in the private sector of the economy;

(4) to provide a regulatory process that balances the needs of carriers, shippers, and the public; and

(5) to assist in the rehabilitation and financing of the rail system.

Pub.L. No. 96–448, §§ 2–3, 94 Stat. 1896–97.

**3.** See, e. g., 49 U.S.C.A. §§ 10701a(b)(3), 10704 (1981 pamphlet).

**4.** "(2) In making a determination under this section, the Commission shall find that the rail carrier establishing the challenged rate does not have market dominance over the transportation to which the rate applies if such rail carrier proves that the rate charged results in a revenue-variable cost percentage for such transportation that is less than—

the common carrier obligations of the railroad to another shipper, or unreasonably discriminates against a port, and (2) in the case of transportation of agricultural commodities, in addition to the grounds listed above, whether the contract either discriminates against a shipper or constitutes a destructive competitive practice. Subsection 208(i)(1), 49 U.S.C.A. § 10713(i)(1), exempts contracts filed with the ICC from the other provisions of the Interstate Commerce Act and from any further review by the ICC except as permitted above. Subsection 208(i)(2), 49 U.S.C.A. § 10713(i)(2), vests exclusive jurisdiction for enforcement of such contracts in the courts of the United States or in the appropriate state court. On its face, therefore, it would appear that section 208 is in a sense a provision wholly independent from the rest of the Interstate Commerce Act. So much appears to be the conclusion reached in the Conference Report:

> The provision [Section 208] establishes a separate class of rail service and thereby makes carriers entering into such contracts both common carriers and contract carriers. Once a contract is approved by the Commission or goes into effect because the Commission has not acted within the specified time limits, the service provided under the contract is exempt, ... from all regulation and all of the requirements of the Interstate Commerce Act.... Once contracts are approved under this section, they are to be enforced in the courts and not at the Commission.

"(A) 160 percent during the period beginning on the effective date of the Staggers Rail Act of 1980 and ending September 30, 1981;
"(B) 165 percent during the period beginning October 1, 1981, and ending September 30, 1982;
"(C) 170 percent during the period beginning October 1, 1982 and ending September 30, 1983;
"(D) 175 percent or the cost recovery percentage, whichever is less, during the period beginning October 1, 1983, and ending September 30, 1984; and
"(E) the cost recovery percentage, during each 12-month period beginning on or after October 1, 1984.
For purposes of subparagraphs (D) and (E) of this paragraph, the cost recovery percentage

H.Conf.R. No. 1430, 96th Cong., 2d Sess. 100, *reprinted in* [1980] U.S.Code Cong. & Ad.News 3978, 4110, 4132.

In light of the changes made by the Staggers Rail Act, many questions will inevitably arise as the new Act is implemented and as the Interstate Commerce Commission and the courts themselves become adjusted to their new roles. It would be indeed unwise for us to anticipate in advance, or to attempt to resolve upon an incomplete record, any issues beyond those demanded by the cases immediately before the court. Both E & LS and the ICC have urged this court to decide this appeal on the basis of pre-Staggers Rail Act law. They argue that a "retroactive" application of section 208 to the contract in this dispute, so as to divest the ICC's jurisdiction over the E & LS rate proposals and to vest jurisdiction for the contract dispute back in federal district court, would constitute a waste of administrative expertise and effort since the ICC has already begun its rate determination.[5] They also contend that application of section 208 would impose a hardship on the parties, and would be otherwise inequitable since the parties did not anticipate the new law and had every reason to believe that the ICC would continue to exercise its expertise in setting freight rates for the subject traffic. However, the posture of the appeal here is particularly interesting because, in fact, the Staggers Rail Act was in effect, albeit retroactively, on the day the district court rendered its decision dismissing Hanna's complaint.

> shall in no event be less than a revenue-variable cost percentage of 170 percent or more than a revenue-variable cost percentage of 180 percent.

Pub.L. No. 96–448, § 202, 94 Stat. 1900.

5. After filing of briefs and presentation of oral arguments, while this appeal was pending, the ICC rendered its final decision in the administrative proceeding contesting the E & LS rate increases. *See Rates on Iron Ore, Randville to Escanaba Via Iron Mountain,* (No. 37507) and *The Hanna Mining Company v. Chicago and North Western Transportation Company, et al.* (No. 37516) (decided July 16, 1981). Our decision today does not consider or intimate a view as to the correctness of this decision.

In the companion case being decided today,[6] we deal at length with the question of applying the Staggers Rail Act to cases that were either pending at the Interstate Commerce Commission or on appeal at the time the new statute came into effect. Suffice it for our purposes here to note that in that opinion, we have held that under principles and authorities relied upon by the Eighth Circuit in *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796 (8th Cir. 1981), *Iowa Public Service Co. v. Interstate Commerce Commission*, 643 F.2d 542 (8th Cir. 1981), and fortified by the intent of Congress as manifested in section 229 of the Staggers Rail Act and elsewhere in the legislative history, the ICC retained jurisdiction to decide rate cases pending before it as of the effective date of the Staggers Rail Act, and that, concomitantly this court retained jurisdiction and the responsibility to review such ICC decision.

We have further held that with respect to those rates that are finally adjudicated through the review process and thus are found to be in effect on October 1, 1980, and where those rates are established by agreements between a shipper and carrier that were in existence before the Staggers Rail Act, such rates and agreements are subject to treatment as any other contract rate agreement filed with the ICC pursuant to section 208 of the new Act with any enforcement remedies thereafter vested in the appropriate federal or state court. Correspondingly, we have rejected the position of the ICC that it retains some residual jurisdiction to review pre-Staggers Rail Act rate agreements and to establish maximum reasonable rates for traffic covered by such agreements, where such rates and agreements then in effect were not the subject of proceedings before the Commission or on review as of October 1, 1980.[7] The question of the legality and existence of such contracts remains subject to challenge by either of the parties to that alleged contract

in the appropriate state or federal district court as provided for by subsection 208(j), 49 U.S.C.A. § 10713(j). It is not thereafter subject to further review by the ICC, notwithstanding its claim to the contrary, *see* 49 U.S.C.A. § 10713(i)(1).

With respect to this case, therefore, we affirm the judgment of the district court, noting that it is without prejudice to the right of either party to challenge the validity or existence of the contract, or commence a plenary action against the other based upon breach of contract, as envisioned by section 208 of the Staggers Rail Act.

Affirmed.

---

6. *The Cleveland Cliffs Iron Co. and Burlington Northern, Inc. v. Interstate Commerce Commission*, 664 F.2d 568 (6th Cir. 1981).

7. This appears to be a position asserted by the Commission in its "Interpretive Statement-Contract Rates," decided November 5, 1980.