664 F.2d 568
 The CLEVELAND CLIFFS IRON COMPANY, (79-3775, 80-3159),
Burlington Northern, Inc., (79-3777, 80-3020, 80-3161), Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
The Cleveland Cliffs Iron Company, Burlington Northern,
Inc., Minnesota Power and Light, Detroit Edison
Company, Intervenors.
 Nos. 79-3775, 79-3777, 80-3020, 80-3159 and 80-3161.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 21, 1981.
Decided Nov. 20, 1981.
 
 Joseph M. Oliver, Jr., Herbert J. Martin, Frederick W. Claybrook, Jr., Crowell & Moring, Washington, D. C., for petitioners in Nos. 79-3775 and 80-3159.
 Richard A. Allen, Gen. Counsel, I.C.C., Washington, D. C., for respondents in all cases.
 
 
 1
 Kathleen Dollar, Gen. Counsel, I.C.C., Washington, D. C., for respondents in Nos. 79-3775 and 79-3777.
 
 
 2
 John J. Powers, II, D. J. Conway, Robert J. Wiggers, Antitrust Div., Appellate Sec., Dept. of Justice, Washington, D. C., for respondents in No. 79-3775.
 
 
 3
 James O. Coates, Cincinnati, Ohio, for Burlington Northern, Inc.
 
 
 4
 Leon L. Wolf, Smith & Schnacke, Cincinnati, Ohio, for intervenor Minnesota Power and Light Co., in both cases.
 
 
 5
 John F. Donelan, Frederic L. Wood, Donelan, Cleary, Wood & Maser, Washington, D. C., for intervenor Minnesota Power & Light Co., in No. 79-3775.
 
 
 6
 Richard J. Hardy, Washington, D. C., John B. Pinney, Graydon, Head & Ritchey, Cincinnati, Ohio, for Detroit Edison Co., in both cases.
 
 
 7
 Robert Lewis Thompson, Antitrust Div., Dept. of Justice, Washington, D. C., for respondent I.C.C. in No. 79-3775, and for respondents in Nos. 79-3777, 80-3020 and 80-3161.
 
 
 8
 Alan R. Post, Curtis H. Berg, St. Paul, Minn., for Burlington Northern, Inc.
 
 
 9
 Lawrence D. Walker, Taft, Stettinus & Hollister, Cincinnati, Ohio, for Cleveland Cliffs Iron Co. in both cases.
 
 
 10
 Benjamin R. Civiletti, Atty. Gen. of the U. S., Dept. of Justice, Washington, D. C., for respondents in No. 80-3159.
 
 
 11
 Thomas S. Calder, Cincinnati, Ohio, R. Eden Martin, John Will Ongman, Washington, D. C., for petitioners in Nos. 79-3777, 80-3020 and 80-3161. Howard J. Trienens, Richard J. Metzger, Chicago, Ill., for petitioners in Nos. 79-3777 and 80-3020.
 
 
 12
 D. Gary Reed, Cincinnati, Ohio, for petitioners in No. 80-3161.
 
 
 13
 Before ENGEL, KEITH and MERRITT, Circuit Judges.
 
 
 14
 ENGEL, Circuit Judge.
 
 
 15
 Burlington Northern, Inc. (BN) and the Cleveland Cliffs Iron Company (CC) seek review of a decision of the Interstate Commerce Commission, reported at 362 I.C.C. 625 (1980). That decision found BN's proposed freight rate increases to be "unreasonable" and set the maximum reasonable rates for three separate line movements at levels established in preexisting rate agreements which the Commission found to exist between BN and three individual shippers.
 
 
 16
 CC was one of these shippers. The two other shippers are utility companies, Minnesota Power & Light Company (MPL) and Detroit Edison Company (DE), both of whom have filed briefs as intervenors in support of the Commission's decision as it applies to their respective freight rates.[1]
 
 I.
 
 17
 The facts regarding each shipper's business activities, its decision to purchase western coal, and to ship this coal on the BN railroad are set forth in detail in the Commission's decision. See 362 I.C.C. at 628-34. We briefly summarize them here.
 
 
 18
 Minneapolis Power & Light Company generates and transmits electric energy within Minnesota. Before 1970, MPL purchased and burned bituminous coal mined in West Virginia and Kentucky. In 1967, MPL decided to construct a new 350,000 kilowatt generating unit in Cohasset, Minnesota, where it already had in operation two 70,000 kilowatt generating units. The new plant was designed to burn western coal, and the two existing units were converted to burn western coal. The coal is supplied by Peabody Coal Company under a long-term contract and is transported by BN.
 
 
 19
 Detroit Edison generates and transmits electricity to Detroit and generally throughout southeastern Michigan. Until 1973, DE purchased and burned eastern coal. In the early 1970's it became interested in low-sulphur western coal because of EPA clean air standards. DE subsequently entered into a long-term contract with Decker Coal Company for the supply of western coal. BN provides rail transportation service.
 
 
 20
 Cleveland Cliffs manages four iron mines and five pelletizing plants located in the Upper Peninsula of Michigan. It also owns approximately 90% of the Upper Peninsula Generating Company and uses this company's electrical power to operate these mines. A 1974 expansion of mine operations required a corresponding increase in electrical generating capacity, and in 1975 CC began construction of three additional 80,000 kilowatt generating units designed to use low-sulphur western coal. CC contracted with various coal suppliers for western coal from Montana. BN provides rail transportation service.
 
 
 21
 In reaching a decision to construct new facilities or convert existing facilities to burn low-sulphur western coal, the shippers considered other options including the construction of plants that burned eastern coal and, in the case of MPL, the construction of a nuclear power plant. All three shippers entered into concurrent negotiations with coal companies and with BN (or its predecessor) for the supply and transportation of coal. In deciding to use western coal and to contract with western coal producers, each shipper reached an understanding with BN regarding the cost of transporting western coal to destinations in the Great Lakes region.[2] Each agreement contained a basic freight rate with a built-in escalation formula for future rate increases, as well as a "gross inequity" clause for rate adjustments where circumstances so required.[3]
 
 
 22
 After the coal supply commitments and investments had been made and the shippers were receiving the coal, BN initiated negotiations seeking rate increases beyond those established under the agreements (as determined by the escalation formula), relying upon the gross inequity clause. When the shippers resisted the proposed increases, BN published the higher tariffs with the ICC, thereby superseding the lower rates under the agreements.
 
 
 23
 Each shipper filed a complaint, and the ICC in each case began its own investigation into the reasonableness of the rate increases. The ICC initially determined that BN occupied a position of "market dominance" on the western rail routes involved.[4] On December 26, 1979, the ICC issued a brief final decision finding BN's published rates not reasonable and ordering BN to cancel the proposed rates and to refund any monies collected in excess of previously established rates. This was the last day of the ICC's ten-month statutory deadline under 49 U.S.C. § 10707(b)(1) (1979 Supp. III) for issuing a final decision. On March 10, 1980, the ICC issued a longer opinion explaining its decision of December 26 and establishing the maximum lawful freight rates at the levels found in the individual BN-shipper agreements as escalated pursuant to the built-in formulas. In reaching this decision, the ICC stated that it had considered the privately negotiated rate agreements in its reasonableness determination according to its new "contract rates" policy,[5] as well as the traditional criteria and cost analyses. It is this decision that we now review.
 
 II.
 
 24
 We first address a preliminary jurisdictional matter raised by the railroad. BN argues that by deferring until March 10, 1980, the issuance of its final explanation of the December 26, 1979 decision, the ICC violated the ten-month deadline for a final decision imposed by 49 U.S.C. § 10707(b)(1); therefore, BN argues the ICC acted unlawfully and without jurisdiction when it declared the rates unreasonable. BN also claims that the ICC was without authority to order a refund of monies collected.
 
 
 25
 Despite BN's protests to the contrary, we find that the ICC acted properly. Its December 26, 1979 decision was final and appealable, declaring that BN's proposed tariffs were not reasonable. While certainly it would have been preferable for the Commission to have published its entire decision on December 26,[6] we are unable to read the statute as imposing any jurisdictional bar to ICC or judicial review due to the Commission's failure to do so. Even if we assumed the final decision did not come until March 10, 1980, under 49 U.S.C. § 10707 the only consequence of failing to meet the ten-month period is that the rate, if suspended, becomes effective. Under subsection 10707(b)(2): "If an interested party has filed a complaint under subsection (a) of this section (as the shippers in this case did), the Commission may set aside a rate ... that has become effective under this section if the Commission finds it to be in violation of this chapter." Thus, the Interstate Commerce Act itself clearly allows the Commission to set aside a rate that has become effective if that rate is later found to be unlawful. See Houston Lighting & Power Co. v. United States, 606 F.2d 1131, 1142 (D.C.Cir.1979), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). Moreover, 49 U.S.C. § 11701 authorizes the ICC to begin an investigation on its own initiative and requires the Commission to complete the investigation within three years. Only if the ICC fails to meet this deadline is the investigation "dismissed automatically." 49 U.S.C. § 11701(c). The Commission's investigation did not contravene this deadline.
 
 
 26
 Finally, the Commission was not precluded from ordering a refund in this case. We first note that the December 26, 1979 final decision explicitly ordered BN to refund any funds collected under the rate proposals that were declared unlawful. This action concededly fell within the statutory deadline. The refund order subsequently was stayed at the behest of BN.
 
 
 27
 BN admits that the Commission's refund power is coextensive with the Commission's authority to declare rates unreasonable. Nothing in section 10707 indicates that the Commission is divested of refund authority as long as it retains the power to investigate and declare the rate unreasonable. In fact, if a rate is not suspended, 49 U.S.C. § 10707(d)(1) requires the Commission to order a refund of amounts collected under an unreasonable rate when final action is taken. Since we find that the March 10, 1980 decision was valid, the ICC's refund order attending that decision was also valid, particularly in light of the prior refund order in the December 26 decision.
 
 III.
 
 28
 The "contract rates policy" which the ICC applied in each of these rate disputes was first formally announced on November 9, 1978. It was followed by an additional statement on April 10, 1979, and finally set forth in a statement dated February 21, 1980. Because of its importance to the decision here, it is reproduced in full as Attachment A.
 
 
 29
 Basically, the contract rates policy announced that the ICC would take notice of and give evidentiary weight to privately negotiated rate agreements when determining the reasonableness of a proposed rate filed with the Commission.[7] The policy statement distinguishes between those privately negotiated agreements entered into before the November 9, 1978 policy statement and those entered into after that date:
 
 
 30
 In regard to contracts entered into after issuance of the Commission's November 9, 1978 policy statement ..., we will view the existence of such a contract as creating a presumption that a proposed rate change in excess of the contract rate is unreasonable in violation of the Interstate Commerce Act. However, there may be unusual and compelling circumstances which would rebut this presumption and warrant our upholding a rate change in excess of a contract rate.
 
 
 31
 (W)ith respect to agreements entered into before our 1978 policy statement, the Commission will weigh the alleged agreement, together with all other factors bearing on the reasonableness of the proposed rate. Consideration of these factors may lead us to prescribe or approve a rate within a range from the contract rate to the maximum reasonable rate that would apply in the absence of a contract.
 
 
 32
 Interstate Commerce Commission, Ex Parte No. 358-F "Change of Policy, Railroad Contract Rates" (decided February 21, 1980), Attachment A at pp. 571, 572.
 
 
 33
 BN asserts that the ICC violated the language and intent of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31 (hereinafter referred to as the "4R Act") by enforcing what it conceived to be binding contracts between BN and the various shippers. This was improper, it claims, because there were in fact no contracts to be enforced. Specifically, BN argues that (1) there were no actual contractual instruments, (2) there was an absence of mutual obligation between BN and each shipper because the shippers were not bound to transport specific amounts of coal at any particular time, and (3) there was no intent to be bound by the alleged agreements since the parties knew that contracts were per se illegal, according to the Commission's decision in Guaranteed Rates, Sault Ste. Marie, Ontario to Chicago, 315 I.C.C. 311 (1961).
 
 
 34
 These arguments are not persuasive. The Commission did not find that the agreements between BN and the shippers were "contracts" to be enforced as such as a matter of contract law. Instead, the Commission applied the agreements in a more limited fashion. It was sufficient, in the view of the ICC, to find that the parties intended to set the freight rates by mutual agreement and that each of the shippers relied upon those rates in deciding to use western coal instead of some other energy source. We respect the Commission's effort to confine itself to considering these factors in an evidentiary fashion, without endeavoring to make a judicial or legal analysis of all the elements associated with formal contract formation and performance under the law of contracts. See Increased Rates on Coal, Burlington Northern, Inc. Montana to Superior, Wisconsin, Docket No. 37135 (decided April 4, 1980). At least with respect to agreements existing before the issuance of the first policy statement in 1978, the ICC has determined that it would give them great but not controlling weight if it was satisfied that (1) the parties intended to be bound by the agreement, (2) the shipper reasonably relied on the contract to its substantial detriment, and (3) public interest considerations warrant holding the parties to the agreement.
 
 
 35
 There is substantial evidence in the record to support the Commission's finding that the parties intended that the agreement should govern the freight rates between them and that each of the shippers did, in fact, rely upon the agreement in committing itself to ship coal across the particular rail lines at the established rates. As noted in the ICC's decision, BN entered into extensive negotiations seeking an acceptable base freight rate. The parties exchanged a considerable amount of documentation and settled upon an escalation formula to govern future rate increases. These certainly were not empty gestures.
 
 
 36
 Contrary to the petitioners' claims, contract rates were never clearly illegal per se. Since H. P. Hood & Sons v. Delaware & Hudson Co., 17 I.C.C. 15 (1909), the ICC has given at least some consideration to privately negotiated contracts between shippers and rail carriers. See e. g., C. A. Wagner Construction Co. v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 219 I.C.C. 317 (1936); Booth & Olson, Inc. v. Chicago, Burlington & Quincy R.R. Co., 222 I.C.C. 569 (1937); Ideal Cement Co. v. Atchison, Topeka & Santa Fe Railway Co., 280 I.C.C. 55 (1951). A fair summary of ICC's historic perspective on private agreements is found in McConville Coal Co. v. Iowa Southern Utilities Co., 172 I.C.C. 627, 632 (1931):
 
 
 37
 The Commission will not undertake to enforce, interpret, or determine the legal effect of an agreement, nor will it be bound thereby in the determination of the question in this case. The promise may, however, be regarded as of evidentiary value, to be considered together with all other facts, circumstances, and conditions, that may reasonably apply to the situation under investigation. H. P. Hood & Sons v. Delaware & Hudson Co., 17 I.C.C. 15.
 
 
 38
 With respect to Guaranteed Rates, supra, its language regarding the illegality of privately negotiated contracts was primarily dictum to which only four members of the Commission agreed. Moreover, that case presented a peculiar factual situation in which the ICC was called upon to review an anticompetitive contract restraining competition between carriers.[8]
 
 
 39
 BN also asserts that the application of the contract rates policy to this case violates section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1976), because the ICC failed to engage in a rule-making proceeding before establishing the policy. We agree with the Eighth Circuit in Iowa Power & Light Co. v. Burlington Northern, Inc., 647 F.2d 796 (8th Cir. 1981), that the claim is without merit. See 647 F.2d at 811. The APA defines a "rule" which is subject to the rule-making procedures of the Act as:
 
 
 40
 The whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy, or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates.
 
 
 41
 5 U.S.C. § 551(4). On the other hand, a "policy statement," exempt from rule-making, has been defined as a statement issued to "advise the public prospectively of the manner in which the agency propose(s) to exercise a discretionary power." Attorney General, Manual on the Administrative Procedure Act, at 30 n.43 (1947). The contract rates policy statement involved here clearly is intended to apply, although to a more limited extent, to rate agreements which were in effect before the statement was first promulgated, and it is on the basis that BN claims that it cannot be considered a general policy statement exempt from the APA rule-making procedure.
 
 
 42
 In determining whether an agency statement qualified as a policy statement or as a binding rule, the courts generally have employed two criteria:
 
 
 43
 First, courts have said that, unless a pronouncement acts prospectively, it is a binding norm.
 
 
 44
 The second criterion is whether a purported policy statement genuinely leaves the agency and its decision-makers free to exercise discretion.
 
 
 45
 ... If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is-a binding rule of substantive law.
 
 
 46
 American Bus Association v. United States, 627 F.2d 525, 529 (D.C.Cir.1980) (citations omitted). In American Bus, the D.C. Circuit inquired whether the alleged policy statement was " 'finally determinative of the issues or rights to which it was addressed.' " Id. at 531. The court first looked to the language of the policy statement and found that "nothing in it even hints to those who will apply the statement that they may exercise any discretion in doing so." Id. at 532. The court further found that the statement was "not 'simply a general pronouncement of the broad policy considerations which will motivate the Commission as it addresses itself to its appointed tasks ...' but rather, 'is in reality a flat rule of eligibility.' " Id. at 531-32.
 
 
 47
 Comparing the language of the contract rates policy statement which appears in Attachment A, with the criteria set forth in American Bus, we are of the opinion that to the extent that the policy statement announces the ICC's intention to accord weight to pre-1978 agreements, it cannot be said to impose a flat rule inflexibly governing the exercise of Commission discretion.[9] Given the history of the Commission's authority over railroad rates, its responsibility under the 4R Act to make an independent determination of rate reasonableness, and the fact that private agreements have been accorded evidentiary value in numerous past ICC decisions, we conclude that the contract rates policy statement imposes no new obligations which might invoke the requirement or rule-making under the APA. "The statement in no way established a binding norm for future rate cases, but instead left the Commission free to exercise considerable discretion in considering whether, and to what extent, to enforce contracts prior to 1978." Iowa Power & Light, supra, 647 F.2d at 811-12.
 
 
 48
 BN still maintains that the retroactive application of the contract rates policy to the agreements is arbitrary and capricious, in violation of section 10(e) of the APA, 5 U.S.C. § 706, since the Commission failed to consider and weigh the benefits of retroactive application against the adverse effects on private interests. BN further claims that retroactive application has precluded it from submitting evidence and arguments concerning the applicability of the contract rates policy to the current rate dispute, again in violation of sections 5 and 7 of the APA, 5 U.S.C. §§ 554, 556. In this respect, BN relies upon Port Terminal Railroad Assn. v. United States, 551 F.2d 1336 (5th Cir. 1977), and Hill v. FPC, 335 F.2d 355 (5th Cir. 1964), and argues that the ICC, by imposing new rate-making standards without notice to the parties, deprived it of a fair hearing.
 
 
 49
 In NLRB v. E & B Brewing Co., 276 F.2d 594, 600 (6th Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961), our court held that retroactive application of a change of policy should not occur where it will "work hardship upon a party altogether out of proportion to the public ends to be accomplished," citing NLRB v. Guy F. Atkinson Co., 195 F.2d 141 (9th Cir. 1952). At the same time the court observed: "It is not suggested that under no circumstances may an administrative ruling apply retroactively.... (A)ny 'case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency.' " 276 F.2d at 600. These principles were in turn recognized by the D.C. Circuit in Retail, Wholesale and Department Store Union v. NLRB, 466 F.2d 380 (D.C.Cir.1972), which articulated the following considerations that should govern any determination to apply new administrative standards and rules retroactively:
 
 
 50
 (1) whether the particular case is one of first impression;
 
 
 51
 (2) whether the new rule represents an abrupt departure from well established practice;
 
 
 52
 (3) the extent to which the party against whom the new rule is applied relied on the former rule;
 
 
 53
 (4) the degree of the burden which a retroactive order imposes on a party; and
 
 
 54
 (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 55
 Id. at 390. With respect to the hearings in the joint investigatory proceedings and with respect at least to its decision as it affected MPL and DE, the Commission did not err in retroactively applying the policy statement. First, the record indicates that during the administrative proceedings BN presented evidence and argument regarding the existence of and effect to be given the rate agreements. Furthermore, since we have found substantial evidence in the record that BN intended to be bound by the agreements, it was not an abuse of discretion or arbitrary for the Commission to accord those agreements weight, pursuant to its contract rates policy, in reaching its decision as to the reasonableness of BN's proposed rate increases.[10] Retroactive application did not impose a hardship on BN that was out of proportion to the public purpose sought. Accord, Iowa Light & Power Co., supra, 647 F.2d at 812.
 
 
 56
 In summary, we conclude, as a general matter, that it was neither unlawful nor an abuse of discretion for the ICC to have applied its policy statement in making its reasonableness determination in each of the three cases. The issue then becomes whether the policy was properly applied in each case or whether the ICC violated its statutory responsibility under the Interstate Commerce Act, as amended by the 4R Act.
 
 IV.
 
 57
 As noted above, the contract rates policy states that, with respect to private rate agreements entered into before the 1978 policy statement, the Commission will weigh the alleged agreement with all other factors bearing on the reasonableness of the proposed rate, including the public interest. The Commission observed: "Consideration of these factors may lead us to prescribe or approve a rate within a range from the contract rate to the maximum reasonable rate that would apply in the absence of a contract." ICC, Ex Parte No. 358-F, supra, Attachment A at p. 594. The foregoing language of the policy statement assured flexible application and avoided any conflict with the APA's rule-making requirements. This language convinces us that, at least with respect to the consideration of rate agreements pre-dating the 1978 policy statement, the ICC did not intend to shirk its responsibility to investigate independently the reasonableness of rates. The policy statement obliges the Commission not only to consider the alleged agreement, but "all other factors bearing on the reasonableness of the proposed rate," ICC, Ex Parte No. 358-F, supra, Attachment A at p. 594. The Commission still operated under the traditional statutory duty to protect shippers, and consequently the public, against rates which for one reason or another were found to be unreasonably high, particularly where the carrier enjoyed "market dominance" over the line movement or where the purchaser of rail service could be characterized as a "captive shipper."[11]
 
 
 58
 While we therefore conclude that it was appropriate for the Commission to have promulgated its policy statement as it did, we likewise conclude that such a policy could not and was not intended to supplant the Commission's normal responsibilities under the statute to determine rate reasonableness both from the point of view of the specific carrier and shipper, as well as the general public interest. It also follows that our court is not relieved of the obligation of reviewing the underlying record, at least to the extent necessary to determine that the Commission's enforcement of the agreed rate was not arbitrary and capricious and did not amount to an abdication of its general responsibilities under the Interstate Commerce Act at the time.
 
 
 59
 BN contends that the ICC failed to adhere to the ratemaking standards articulated in the 4R Act and failed to set a rate that accorded the railroad adequate revenue and a proper rate of return on capital investments.[12] On the other hand, CC claims that the ICC abdicated its independent duty to investigate and set maximum reasonable freight rates in order to protect the general public interest as well as the specific interests of the individual shipper and carrier. We conclude that, with respect to the rates set for the BN-MPL and BN-DE line movements, the ICC carried out its statutory responsibility. However, with respect to its decision regarding the two separate BN-CC rates, we conclude that the ICC abdicated its independent review responsibility under the Interstate Commerce Act as it existed at the time, and therefore its determination cannot stand.
 
 
 60
 In reviewing the reasonableness of the rates for each of the three shippers, the Commission received and considered the same evidence and made the same factual determinations that would have been made in determining questions of reasonableness where no contract agreement was in issue. Published with its opinion were detailed analyses of the cost of service data submitted by BN and the three shippers. While specific complaints with respect to certain methods of cost analysis will be addressed later, it is sufficient for our purpose here to observe that if the statistical data and the ICC's conclusions concerning reasonableness are supported by the record, then the rates established by the BN-MPL and BN-DE agreements were consistent with those rates which would otherwise have been considered reasonable and lawful rates had such agreements not existed.[13] Contrary to BN's claim, the Commission performed a meticulous review of the cost of service and financial evidence. See 362 I.C.C. 625, 647-99 (1980). There is substantial evidence in the record that the Commission was concerned with BN's rate of return on capital investments and its need to raise revenue. That the ICC did not readily accept certain portions of BN's cost evidence does not, in itself, indicate that the ICC failed to abide by the 4R Act's rate-making policy considerations and standards. Therefore unless there is some serious error in the Commission's factual findings in these two instances, we conclude that the ICC did not fail to adhere to the rate-making standards under the 4R Act.
 
 
 61
 The same conclusion, however, cannot be made with respect to the Commission's determination of rates for the BN-CC movements from Colstrip and Kuehn, Montana. CC's principal argument is that the ICC merely considered and adopted the rate agreement existing between BN and CC in reaching its reasonableness determination. While CC acknowledges that the ICC has authority to consider the rate agreement when reaching its determination, it argues with great reason that the Commission cannot rely solely upon that agreement, but must consider other factors-specifically the protection of the public interest, avoidance of discriminatory treatment (a discrimination which it asserts exists in this case due to the disparate rates between the shippers), and the protection of the shipper from rates that result in an unduly high or unjustified level of return for the market dominant carrier.
 
 
 62
 Unlike the decision in the BN-MPL and BN-DE rate cases, the adoption of the BN-CC contract rates, pursuant to the strict application of the contract rates policy, leads to inconsistent results. This is most clearly evidenced by the Commission's own opinion:
 
 
 63
 If BN had not filed the increases under investigation, the annual escalation formula of its letter of understanding with CC would have produced a July 1, 1979, rate of $10.03 per ton. The rates which the Commission would have found to be reasonable rates based on costs plus the seven percent additive ($6.74 per ton from Kuehn and $6.59 from Colstrip) in absence of a letter of agreement, would have been lower than the rate agreed to by the shippers ($10.03 per ton from each origin) and lower than the proposed rate ($11.23 PER TON) WHICH IS UNDER INVESTIgation.
 
 
 64
 362 I.C.C. at 641. Nevertheless, the ICC decided to hold to the BN-CC agreed rate as escalated, stating:
 
 
 65
 Although the rate increases under investigation on the CC movements are of a lesser magnitude than the increases applied to the MP & L and DE movements, our restatements of costs for these movements show the assailed increases to be completely unwarranted. We do not, however, believe that prescription of a maximum reasonable rate below the escalated letter-of-understanding rate would be proper. CC studied the delivered cost of both eastern and western low-sulphur coal before it signed the letter of agreement with BN. Its study showed that the delivered price of eastern and western coal would be approximately equal. CC specifically states that it decided to purchase Montana coal to be moved by BN on the assumption that the rates and annual escalation formula offered by BN and the economics of mining western coal would produce lower overall fuel costs in the future. It signed the letter of agreement with full knowledge that its rates were substantially higher than rates applicable to the MP & L and DE movements. CC certainly relied on the letter of understanding when it entered into three contracts to purchase coal and a contract for use of the Ortran dock facilities of Superior. On the other hand, CC has submitted testimony that the letter of understanding with BN was "negotiated at arm's length and * * * provided significant benefits to both parties."...
 
 
 66
 We believe these parties should continue to receive the benefits of their agreement. Considering the cost evidence of record and the circumstances surrounding the letter of understanding between BN and CC, we conclude that the maximum reasonable rate for the Kuehn and Colstrip to Superior movements is the rate in effect prior to February 25, 1979, as escalated under the annual escalation formula of this letter of understanding.
 
 
 67
 Id. at 641-42.
 
 
 68
 Thus, the ICC determined that BN's proposed increases for the CC traffic were completely unwarranted on the basis of the cost evidence. Further, the ICC appears to have made a determination that at the time in question a rate of $6.74 per ton from Kuehn and $6.59 per ton from Colstrip would have been reasonable. Beyond this, however, there is nothing to indicate, as a matter of cost analysis, that the rate finally approved (i. e., $10.03 per ton from each origin) was itself reasonable, or that it fell within the "zone of reasonableness," other than as might be inferred from the fact that CC had agreed to it. In fact, there is much to support a conclusion that it was not reasonable, if one at least compares that rate with the substantially lower rates approved for DE and MPL.[14] Most important, the Commission itself acknowledged that the rate it would have found reasonable absent the BN-CC agreement would have been substantially lower. In Unit Train Rates on Coal-Burlington Northern, Inc., I & S No. 9199, (decided September 29, 1980), the Commission explicitly acknowledged that traditional reasonableness standards were an important factor in its "public interest" analysis under the new policy. Yet the Commission's decision here is quite the opposite.
 
 
 69
 In short, we conclude that the ICC, in applying its contract rates policy in the BN-CC rate case, abdicated its independent review responsibility under the Interstate Commerce Act. The ICC has done precisely what its policy statement said would not be done with respect to rates which were agreed upon before November 1978; it has given them almost conclusively presumptive effect. Not only is this in violation of its own policy statement[15] but such an application would, especially where made retroactive, raise serious questions regarding the need for rule-making under the APA. That portion of the ICC decision therefore must be vacated and the cause remanded for further proceedings, consistent with this opinion, regarding the BN-CC freight rates for coal from Kuehn and Colstrip, Montana. In doing so, however, we are obliged to review objections made by both BN and CC concerning certain alleged errors in the Commission's cost analysis. We note at the outset that courts traditionally have applied deferential standards in reviewing rate determinations by any agency that possesses expertise to analyze complicated economic data. Atchison, Topeka & Santa Fe Railway v. Witchita Board of Trade, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). Nevertheless, the courts retain authority to review agency decisions and to determine whether those decisions comport with applicable law, whether they are supported by the evidence, and whether the rationale employed is both discernible and defensible. San Antonio, Texas v. United States, 631 F.2d 831, 836 (D.C.Cir.1980).
 
 V.
 
 70
 BN maintains that the Commission committed three specific accounting errors, all of which led to an understatement of its cost of service and need for revenue, and therefore, to an erroneous decision as to the reasonableness of the proposed rate. First, BN claims that the Commission improperly excluded all capital costs of pre-1977 roadway investments (listed in Rail Form A) from its variable and fully allocated cost analysis. To understand this claim, it is necessary to examine the nature of Rail Form A[16] as a method employed by the ICC for determining the appropriate investment base for calculating costs to be covered by a particular rate proposal. "Rail Form A is a cost accounting procedure that allocates actual expenditures to various rail services. RFA procedures distinguish between variable and constant portions of each expense account." Annual Volume Rates on Coal-Wyoming to Flint Creek, Arkansas, (decided May 30, 1980), p. 6. Among the costs that can be allocated proportionately by this formula are BN's fixed plant investment costs.
 
 
 71
 In determining costs for the particular freight movements under review (and thus, the reasonableness of BN's proposed rates to cover these costs), the ICC indicated that it would allow the railroad a return on the road property listed in Rail Form A since the said coal traffic, to some extent, uses existing roadway investments included in the Rail Form A property.[17] However, since the rate determinations focus on the cost of this particular type of coal haulage and seek to establish a rate to cover this cost, the ICC also indicated that the Rail Form A investment figures must exclude all coal-related fixed plant investments allowed as rate additives and recovered by rate increases in prior years. These investments had to be removed from the Rail Form A systemwide accounts. Otherwise a cost analysis which used the unadjusted Rail Form A would inevitably result in a "double-counting," authorizing a rate that covered costs which had already been reflected in prior rate determinations. See San Antonio, supra, 631 F.2d at 842. The difficulty with the Rail Form A submitted by BN in this case was noted by the Commission:
 
 
 72
 In this proceeding, CC notes that defendant admits that all 1976 coal-related investments were not removed from its Rail Form A return on road property and will, in this proceeding, result in a double-counting of some incremental fixed plant additives previously charged in other traffics. Inasmuch as the evidence of record precludes our restatement of this deficiency, we have disallowed, in its entirety, the return on existing road property as computed in Rail Form A.
 
 
 73
 362 I.C.C. at 657.
 
 
 74
 BN argues that the ICC erred in relying upon the testimony of CC's witness and claims that the operative expense portion as well as the capital portion of coal-related incremental capital expenditures for the entire BN system had been removed from Rail Form A. This claim, however, is contested by MPL and CC, both pointing out that one of the forms BN had filed previously with the Securities and Exchange Commission (Form 10-K) indicates capital expenditures on coal-related traffic of $154 million, while according to BN's own witness only $128 million in capital investments had been removed from Rail Form A for the same years.
 
 
 75
 Our review satisfies us that there was substantial evidence and a discernible rationale to support the ICC's conclusion that not all coal-related expenses were removed from the 1976 Rail Form A accounts. BN's own witnesses appeared uncertain regarding the accuracy of the Rail Form A calculations. BN's economic expert stated that he did not know the actual coal-related expense numbers for 1976 and indicated that the procedures used for 1977 Rail Form A calculations were different from those used in 1976. At one point he acknowledged that the 1976 Rail Form A expenses would have been lower if the 1977 procedures had been applied properly. While BN contends that subsequent testimony demonstrates that any initial mistakes had been corrected, the testimony is ambiguous. The ICC could reasonably conclude that only Rail Form A 1976 accounts were corrected in part and that the form calculations still included investments which had already been recovered by other rate additives. As a result, the ICC disallowed the return in its entirety because "the evidence of record precludes our restatement of this deficiency." 362 I.C.C. at 657. In other words, the ICC was unable to ascertain the amount which BN had failed to remove from Rail Form A and thus operated as a potential double-recovery. In such circumstances, we are unable to hold that the ICC erred in disregarding all Rail Form A investments.
 
 
 76
 BN next contends that the Commission erred in allocating the incremental costs of its coal traffic to all traffic (i. e. non-coal shippers) using the lines in question. BN claims that this decision is directly contrary to the ICC's cost calculations in Annual Volume Rates, Wyoming to Flint Creek, Arkansas, 361 I.C.C. 533 (1979) and Arkansas Power & Light Co. v. Burlington Northern, Inc., 361 I.C.C. 504 (1979). In each of these cases, the ICC refused to allocate a portion of the incremental costs of coal service to non-coal traffic and shippers. In so deciding, the Commission apparently employed a "but for" test for cost allocation and stated that since the railroads would not have made certain investments "but for" unit-train coal service, it would be unfair to impose a share of the costs on uninvolved shippers.[18]
 
 
 77
 While the ICC concedes that it has in the past used the "but for" test, it also cites its decision in Increased Coal Rates on Coal, Colstrip and Kuehn, Montana to Minnesota, 362 I.C.C. 30 (1979), as establishing a new policy that fixed plant investments will be allocated to all traffic that may benefit from the improvements, even though such investments would not have been made absent a specific type of traffic.
 
 
 78
 The record contains evidence that non-coal traffic will obtain some benefit from the fixed plant investments necessitated by the unit-train movements under review, and in fact the ICC specifically so recognized in its March 10 decision:
 
 
 79
 The Commission noted in the SWEPCO decision that the "railroads would not have made these investments (fixed plant) 'but for' unit coal train service." Although BN's evidence of record in this proceeding purporting to support the correlation between fixed plant investment and unit coal train service is quite similar to that shown in SWEPCO, we do not believe the entire claimed amount of fixed plant investment is necessitated only by unit-train coal service. Furthermore, we recognized that these investments, on the one hand, allow better service for noncoal shippers whose freight moves via the subject routes, and, on the other hand, will somewhat reduce the operating expenses of the BN on a per ton basis. Accordingly we agree with complainants that the railroad's incremental fixed plant investments should be allocated to all traffic moving over the subject line segments.
 
 
 80
 362 I.C.C. at 656 (emphasis added). Thus, the Commission apparently credited the evidence of MPL and the other shippers refuting BN's claim that its fixed plant investments were necessitated solely by the heavier coal traffic. It is true that in the prior cases using the "but for" test, the ICC recognized that non-coal shippers would receive some benefit from the investments. Nevertheless, in both Flint Creek and Arkansas Power the ICC had found that the coal traffic was the "sole reason" for the added investment. Here, however, the Commission has suggested that non-coal traffic necessitated to some extent the added investment. Under such circumstances, the Commission did not abuse its discretion or act arbitrarily by requiring the benefitted non-coal traffic to bear part of the cost of the coal-related investments.[19]
 
 
 81
 Finally, BN claims that the Commission erred in not recognizing the cost of its equity capital in determining an appropriate rate of return on the railroad's locomotive and caboose investments. The ICC calculated the rate of return using 9.34%-the interest rate found in BN's current equipment trust certificates. 362 I.C.C. at 685. BN claims that the equipment trust certificate rate reflects debt financing alone and does not take into account the higher cost of equity capital. BN argues that the 9.34% rate is lower than those approved in other cases and that this violates the 4R Act, which entitled railroads to earn a return on all "capital employed in the business" and to "raise needed equity capital." 49 U.S.C. § 10704(a)(2).
 
 
 82
 It is true that in Car Service Compensation-Basic Per Diem Charges, Ex Parte No. 334 (served August 10, 1977), the ICC explicitly authorized a return on capital which included equity and debt financing instruments. The ICC, however, distinguishes its decision in Basic Per Diem, claiming that decision arose in a different factual context and involved a different statutory provision. In the present case, because BN leased much of the equipment used for the freight movements under review, the Commission apparently did not believe that a return on capital including equity was full justified. It stated:
 
 
 83
 BN witness Day advocates an annuity equipment costing methodology that treats the equipment as purchased wholly with corporate funds, but he also acknowledges the "rental payment" methodology (-this method is referred to by BN as the interest plus depreciation method) used in prior proceedings. Since the BN is able to use some sort of lease rather than purchase this equipment, we have reservations about accepting a cost of capital that is not necessarily incurred. Consequently, we shall continue to employ the "rental payment" costing methodology.... It is our belief that 9.34 percent represents the interest rate of BN's current equipment trust certificates for this calculation.
 
 
 84
 362 I.C.C. at 685.
 
 
 85
 In Annual Volume Rates on Coal-Wyoming to Flint Creek, Arkansas, 361 I.C.C. 533, 547 (1979), and San Antonio, Texas v. Burlington Northern, Inc., 362 I.C.C. 161, 165 (1979), the ICC indicated that it would use a rate of return for equipment based upon equipment trust certificates. Thus, there is ICC precedent for the method and supporting rationale employed here to calculate the rate of return on this equipment. Given BN's witness testimony acknowledging this technique, as well as the evidence that many of the BN locomotives were acquired by lease instead of direct purchase, we cannot accept BN's claim that the ICC erred or abused its discretion in fixing the return at the equipment trust certificate level in order to approximate the "rental" cost of this equipment. Accord, Iowa Public Service Co. v. Interstate Commerce Commission, 643 F.2d 542, 547-48 (8th Cir. 1981).
 
 
 86
 With respect to CC's cost-accounting arguments, we observe in the first instance that in vacating so much of the order as applies to the CC rates for Colstrip and Kuehn and remanding to the Commission, we conceive that the Commission will accord to both BN and CC the right to introduce such additional proofs as may be appropriate in the circumstances, particularly in the light of our findings here.
 
 
 87
 CC contends that the ICC erred by allowing any return on capital for 80% of the locomotives in the Forsyth coal power pool used for the unit-train coal movements since these locomotive units were leased. CC argues that BN has incurred no cost of capital but merely an operating expense.
 
 
 88
 According to the Interstate Commerce Act, the ICC is permitted to allow a return on "capital" employed in the business. 49 U.S.C. § 10704(a)(2). As indicated earlier, it appears that the ICC allowed a rate of return on leased locomotives in order to cover what the Commission viewed as the rental cost of the locomotives, a cost determined by reference to the rate of interest found in the equipment trust certificates which BN used to finance its acquisition of these locomotives. The Commission expressly stated:
 
 
 89
 (T)his equipment is usually financed by equipment trust certificates, sale-and-lease back agreements, lease-purchase agreements, and the like.... Since this equipment is not dedicated to the service of a particular shipper (i. e. this equipment is "pooled" for all shippers to use as needed) and because of the different types of financing available, it is our belief that this method (i. e. depreciation and debt rates) approximates a reasonable compensation level ....
 
 
 90
 362 I.C.C. at 685. Based upon our prior discussion and the foregoing language, it appears to us that the ICC has answered both CC's and BN's complaints through this technique of allowing calculated "rental payment" rate of return.[20]
 
 
 91
 CC also argues that the Commission, in determining the cost of service for the BN-CC line movements, should have applied cost evidence submitted by MPL for the BN-MPL rate determination, since certain portions of the MPL and the CC line movements are virtually identical. It appears that the ICC used MPL's evidence for railroad maintenance cost along the BN-MPL line, but then used BN's higher system-wide average maintenance expense levels for the DE and CC lines, even though this traffic moved over line segments quite similar to the MPL line. Likewise, the ICC used MPL's apportionment factors when determining the amount of incremental road investment to be allocated to the BN-MPL variable cost determination. Yet, the ICC refused to apply these apportionment factors to determine variable costs for the BN-DE and BN-CC line movements. For both of these cost determinations, CC claims that the ICC was required by 49 U.S.C. § 10701(b)(2)(B)[21] to apply MPL's specific cost evidence to other shippers' rate determinations if they travel over the same line segments as MPL.
 
 
 92
 The Commission justifies its refusal to apply MPL's railroad maintenance cost evidence to CC on the basis that the evidence has not been broken down into line segment form and therefore the Commission could not ascertain what portions of the MPL evidence were pertinent to the CC movements. Similarly, with regard to apportionment of fixed plant investments to the various line movements, the ICC claims that the apportionment factors submitted by MPL could not be applied to the BN-CC and BN-DE line movements since the MPL evidence was not broken down into line segments. Thus, the Commission accepted BN's higher apportionment factors in calculating the cost of service for CC and DE, it being the best evidence available.
 
 
 93
 From our review of the record, it appears that MPL's roadway maintenance cost analysis was performed on a line segment basis and that several of these line segments were coincident to certain portions of the CC movements. See 362 I.C.C. at 666-67, 644-46. There is also an indication that MPL developed line segment cost evidence for the allocation of incremental fixed plant investments. See 362 I.C.C. at 656-57. We recognize that with regard to the incremental fixed plant allocation factor, the ICC's March 10 decision stressed that MPL's calculations were based on "all" traffic applicable to the unit-train coal movement and that CC had failed to submit the necessary information which would have allowed the ICC to develop allocation factors for "all" other traffic on the BN-CC line.
 
 
 94
 Inasmuch as we have found it necessary to remand the CC's Colstrip and Kuehn rate determinations back to the ICC, we urge the Commission to explain the apparent discrepancy between, on one hand, its justification on appeal for refusing to use MPL's railroad maintenance cost evidence and apportionment factors in the CC rate determination and, on the other, its express recognition in the March 10 decision that MPL's evidence was broken down into line segments. Moreover, it is not clear why MPL's apportionment factors, based on all traffic using the various segments comprising the BN-MPL unit-train movement, could not be applied to the BN-CC unit-train movement, at least for those line segments common to both movements. It may be that the ICC's costing techniques were such that apportionment factors for common MPL-CC line segments could not be used in conjunction with BN's evidence developed for separate CC line segments. On this issue, the ICC should more fully explain its reasoning.
 
 
 95
 CC also argues that the ICC acted inconsistently and arbitrarily in determining the locomotive maintenance cost. It claims the Commission accepted specific evidence offered by CC and DE demonstrating that the average repair cost for locomotives used in the unit-train service was 47.6% lower than the system average because of more efficient utilization of these locomotives. CC contends that this percentage decrease adjustment was in direct response to BN's claim that the heavier weight and greater complexity of the coal locomotives resulted in a 25% increase in locomotive maintenance cost relative to the system average. However, after the ICC accepted CC's 47.6% adjustment, it nonetheless accepted BN's 25% increase based on the size of the locomotive. This, it is argued, is patently inconsistent and erroneous.
 
 
 96
 In its brief, the ICC explains this apparent inconsistency in terms of a two-step cost accounting process for determining locomotive maintenance expenses. First, the Commission apparently accepted BN's 25% upward adjustment since the heavier weight and greater complexity of each coal locomotive results in higher average fuel and maintenance costs per locomotive unit. The ICC then apparently accepted CC's 47.6% downward adjustment when computing the locomotive unit per mile maintenance cost because the higher than average utilization of unit-train locomotives and economies associated therewith results in a decrease in cost on a per-mile basis.[22]
 
 
 97
 We have carefully reviewed the Commission's rationale on this issue and again find an inconsistency with the ICC arguments on appeal.
 
 
 98
 According to the ICC's decision, the BN upward percentage weight adjustment was premised upon the railroad's belief that "repair cost per locomotive unit mile (was greater). This is contrary to DE's claim that the higher utilization of coal locomotives would result in lower unit repair cost per unit-mile." 362 I.C.C. at 664 (emphasis added).
 
 
 99
 We recognize that the Commission has allowed upward adjustment in unit-train locomotive fuel and maintenance costs in the past. See Incentive Rate on Coal-Hayden, Colorado to Kings Mill, Texas, 359 I.C.C. 749 (1979) and Annual Volume Rates on Coal-Wyoming to Flint Creek, Arkansas, 361 I.C.C. 533 (1979). In other cases, the ICC has opted not to allow the weight adjustment. See San Antonio, Texas v. Burlington Northern, Inc., 359 I.C.C. 1 (1978). But in this case the two adjustments seem to be juxtaposed by the ICC's own analysis and therefore somewhat incompatible. Moreover, it appears from the ICC's own rationale that the BN weight adjustment was based on a per unit-mile theory, not just a per unit basis as argued in the ICC brief.
 
 
 100
 We note, however, that BN argued before the ICC that this upward percentage weight adjustment was justified because of the relatively young age of the unit-train locomotives when compared to the average age of locomotives in the system. BN argued that as these unit-train locomotives get older, they become increasingly more expensive to maintain; therefore, the 25% upward adjustment was necessary to correct maintenance costs that would otherwise be understated due to the timing of the ICC rate determination. 362 I.C.C. at 664-65. If the available average repair cost figures were based upon relatively new locomotives that with time incur increased maintenance expenses, the upward adjustment may have been necessary despite the shippers' percentage decrease due to increased efficiency and lower repair costs per unit mile. In this context, both adjustments could be applied consistently. Thus, we cannot say that the ICC abused its discretion and misapplied its expertise in reaching what may well have been a logical compromise between two otherwise flawed cost figures. Upon remand, the ICC should clarify its rationale for making these two adjustments in the CC rate case.
 
 
 101
 CC also claims that the ICC erred in determining the appropriate rate of return on the railroad's equity capital by applying the statutory rate of 46% instead of the computed effective tax rate of 25.96%. CC contends its expert demonstrated that the lower tax rate was the more accurate rate to apply in order to adjust the actual cost of equity upward to account for taxes paid to the government. CC argues that by arbitrarily using the higher statutory tax rate, the Commission gave BN a windfall since the freight rate would reflect a tax liability that would not be incurred. In our opinion, the short answer to this is found in San Antonio, supra. There the court held that the ICC can confer the tax benefit to the railroads by applying the statutory tax rate, since deferred taxes will eventually have to be paid and because use of the statutory tax rate will induce further capital investment. See San Antonio, supra, 631 F.2d at 846-47. San Antonio did not discuss the question whether forgiven taxes should be accorded the same treatment as deferred taxes under this rationale. While CC does not appear to dispute that forgiven taxes can be accorded the same treatment as deferred taxes, it does urge that if the ICC was correct in applying the higher statutory tax rate, the Commission had to subtract the deferred tax account from the net investment here. There is no suggestion in the record here that the ICC did or did not deduct any deferred tax or forgiven tax accounts from the investment base. On remand, the ICC should clarify whether this adjustment was indeed appropriate and in fact performed. In addressing this same question, the D.C. Circuit stated:
 
 
 102
 As this court has recognized ... the principle of excluding a deferred tax reserve from the rate base, as such reserve comes into existence, is an essential component of an agency's election to (use the statutory tax rate).... The Commission's own procedures set forth in Ex Parte No. 338 also underscore the necessity of subtracting the deferred tax reserve from the net investment base....
 
 
 103
 San Antonio, supra, 631 F.2d at 847.
 
 
 104
 Finally, CC attacks the ICC's purported use of the "seven percent solution" which is an additional return granted by the ICC to assure adequate revenue for the railroad. This increment is associated with the practice of "differential pricing" whereby the rates for profitable rail service are set so as to subsidize other less profitable but needed rail service.
 
 
 105
 In the present case the ICC did not actually apply the seven percent additive in making its calculation. Rather, the Commission expressed the opinion that were it to set the maximum reasonable rate under its pre-contract rates policy standards, it may have added the seven percent additive above fully allocated costs. 362 I.C.C. at 641.
 
 
 106
 In San Antonio, the D.C. Circuit chastened the Commission for failing to provide any justification for adding the seven percent increment above fully allocated costs. San Antonio, supra, 631 F.2d at 852. The D.C. Circuit relied upon a prior ICC decision that listed four criteria to be used to determine the need for the percentage increment;[23] the court then directed the Commission "to explain more fully its reasons for selecting a particular increment, if any, above fully allocated costs ...." Id., at 853. We agree that if the Commission should determine to provide an increment above fully allocated costs, it must offer some evidence and a rationale sufficient to support its decision. In making such a decision, the ICC should balance the interests of carriers, shippers, and the public, taking into account the need for railroads to earn adequate revenues yet recognizing its duty to protect captive shippers from monopoly profiteering. However, we do not agree with CC that the railroad must necessarily submit specific evidence on each of the four criteria listed in San Antonio. There may be reasons, wholly apart from these four criteria, that would justify the increment. It is the ICC's duty to follow the rate-making standards found in the Interstate Commerce Act and to provide an adequate justification for its decision.
 
 VI.
 
 107
 The foregoing rulings have all been made in accordance with what the court has conceived to be the appropriate law as it was in effect at the time the petitions were filed, namely the Interstate Commerce Act as amended by the 4R Act. However, the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (1980), 49 U.S.C.A. § 10101 et seq. (1981 pamphlet), became effective between the date of filing of the petitions and the date of the hearing in our court. We therefore requested additional briefing on the issue of what effect, if any, this new statute may have on the disposition of this appeal. We conclude that we are bound to decide this case in accordance with the law as it existed before the Staggers Rail Act. We believe that such a ruling is in accord with the Staggers Rail Act and existing judicial precedent, and that a proper beginning for the operation of the new policy as applied to this case depends upon a proper disposition under the old statutory scheme. As we have held in The Hanna Mining Co. v. The Escanaba and Lake Superior Railroad Co., 664 F.2d 594, No. 80-1681, also decided today, we limit our discussion of the new Act to the extent only that it is required by the facts before us.
 
 
 108
 The Staggers Rail Act of 1980 was signed into law by the President on October 14, 1980, and made effective as of October 1, 1980. The Act makes significant changes in the Interstate Commerce Act, particularly with regard to ICC jurisdiction to review proposed rates and to establish maximum reasonable rates. In essence, the Rail Act sought to deregulate the rail industry by allowing "to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." Pub.L. No. 96-448, § 101(a), 49 U.S.C.A. § 10101a.
 
 
 109
 Two provisions of the Staggers Rail Act are particularly relevant to determining the ICC's and this court's continued jurisdiction over the rate cases under review today. Section 202 establishes minimum threshold revenue-to-variable cost percentages, as a requirement for ICC jurisdiction to find market dominance which, in turn, is the necessary prerequisite for the ICC's authority to investigate the reasonableness of a proposed rate. See 49 U.S.C. § 10709 (1979 Supp. III). For the relevant time frame of this appeal, (i. e., October 1, 1980 to September 30, 1981), the applicable percentage threshold is 160%. Under the Staggers Rail Act, any proposed rate that generated a revenue-to-variable cost percentage of less than 160% could not be reviewed by the ICC for reasonableness. Pub.L. No. 96-448, § 202, 49 U.S.C.A. § 10709(d)(2)(A).
 
 
 110
 Section 208 authorizes rail carriers and shippers to enter into private agreements establishing rates for rail transportation services. Any such contract must be filed with the ICC and becomes valid unless the Commission finds that the contract violates that section.[24] The ICC apparently cannot set the maximum reasonable rate between two contracting parties. Thus, subsection 10713(i)(1) exempts contracts filed with the ICC from the other provisions of the Interstate Commerce Act and from any subsequent review by the ICC. Subsection 10713(i)(2) vests exclusive jurisdiction in the courts for enforcement of contracts that are filed with the ICC.
 
 
 111
 The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate state court or United States District Court, unless the parties otherwise agree.
 
 
 112
 Pub.L. No. 96-448, § 208, 49 U.S.C.A. § 10713(i)(2).[25] Finally, subsection 10713(j), commonly known as a "grandfather clause," deals with contracts that do not technically fall under section 208's filing requirement because they were entered into prior to the effective date of the Staggers Rail Act. The section provides that such contracts have the same effect as do those entered into in accordance with the section. Pub.L. No. 96-448, § 208, 49 U.S.C.A. § 10713(j); See infra at 590-591. As noted in the companion case also decided today, see The Hanna Mining Co. v. The Escanaba & Lake Superior Railroad Co., 664 F.2d 594, No. 80-1681, Congressman Dingell introduced this grandfather provision as an amendment and expressed his intention that pre-existing lawful contracts were to be enforced in courts of law. See 126 Cong.Rec. H8606 (daily ed. September 9, 1980); 126 Cong.Rec. H10085-86 (daily ed. September 30, 1980).
 
 
 113
 BN argues that the Staggers Rail Act should apply and that its proposed rate increases do not reach the minimum revenue-to-variable cost threshold for ICC jurisdiction under section 202. Moreover, BN asserts that under section 208, the shippers must seek enforcement of their rate agreements in the courts. Therefore, BN argues that the ICC reasonableness determinations should be vacated.
 
 
 114
 The application of the Staggers Rail Act to this case is no easy task, for it involves a rate dispute whose genesis and conclusion span a long time frame. The agreements involved in this case were negotiated long before the Staggers Rail Act. The ICC rendered its final decision concerning BN's proposed rate increases (and an appeal was docketed) during the twelve-month period preceding passage of the new statute. Oral argument was heard after the effective date of the new statute.
 
 
 115
 We are firmly of the opinion that a proper construction of the Staggers Rail Act requires us to hold that neither the ICC nor this court is relieved of its respective obligations under the former statute to determine the reasonableness of the challenged rates and the validity of that administrative determination through the typical channels of judicial review. Moreover, we believe the law to be applied is that which was in existence before the enactment of the Staggers Rail Act and upon which the Commission made its decisions in these cases.
 
 
 116
 In reaching this decision, we first note that the House version of the Staggers Rail Act, H.R. No. 7235, 96th Cong.2d Sess. (1980), contained a provision stating that all proceedings and cases pending before the ICC, other agencies, or the courts should be decided under pre-Staggers Rail Act law. The Conference Committee deleted this provision and replaced it with section 706 of the Staggers Rail Act. Section 706 addresses the effect of the new statute on pending rate bureau proceedings, a type of administrative proceeding wholly distinct and apart from the rate reasonableness determinations being reviewed today. However, the portion of the Conference Report accompanying section 706 strongly indicates that Congress intended the courts to decide whether to apply the Staggers Rail Act to cases, other than rate bureau proceedings (i. e., rate reasonableness determinations such as these), that were pending as of October 1, 1980. Specifically, the Conference Report states:
 
 Section 706-Effect on Pending Matters
 
 117
 Senate bill.-No provision.
 
 
 118
 House Amendment.-The House bill contains a provision which states that all applications or proceedings pending before the Commission or other agencies, or any court, shall be determined as if this law had not been enacted.
 
 
 119
 Conference substitute.-The conference substitute deletes the House provision, but clarifies that existing rate bureau proceedings shall be conducted under the law prior to the enactment of this Act. The House bill, as passed, contains a section determining the effect of this legislation on pending matters. The fact that the Conference substitute does not contain a similar provision is not intended to create any implication that other cases now pending at the Commission, other affected agencies, or pending in the federal courts are not to be adjudicated or determined under existing law or the new legislation in accordance with controlling case law. The deletion of these provisions means that existing cases at the Commission, other affected agencies, or pending in the Federal courts, shall be determined as present case law requires that they be determined.
 
 
 120
 H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 142, reprinted in (1980) U.S. Code Cong. & Ad. News 4110, 4174. As we observed in the companion case of The Hanna Mining Co. v. The Escanaba & Lake Superior Railroad Co., 664 F.2d 594, No. 80-1681, we are in general agreement with the Eighth Circuit's rationale in Iowa Power & Light Company, supra, and find that under existing precedent, the Interstate Commerce Commission and this court retained jurisdiction to decide and review these pending rate reasonableness cases, and that the final decision as to the legality of these rates should be based on pre-Staggers Rail Act law.[26]
 
 
 121
 We recognize that with respect to contract rates, Congress has accorded section 208 treatment to those pre-existing contracts which were "lawful" and "in effect" on October 1, 1980.
 
 
 122
 The provisions of this section shall not effect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section.
 
 
 123
 Pub.L. No. 96-448, § 208, 49 U.S.C.A. § 10713(j) (emphasis added). Congressman Dingell's comments on the floor of the House further amplified the intent behind subsection 10713(j):
 
 
 124
 The provision I support was designed to preserve rights related to pre-existing rate agreements whether or not such agreements were previously enforceable. It gives to such contracts the same standing and enforceability as if they were negotiated and signed after the contract provisions of the bill were enacted into law. But it also preserves the legitimate rights of the railroads by guaranteeing that they will be able to challenge the existence of a previously entered lawful contract.
 
 
 125
 126 Cong.Rec. H8606 (daily ed. September 9, 1980).
 
 
 126
 The plain language of Congressman Dingell's amendment, as well as the legislative history reflected by his comments in the House of Representatives, dispels any doubt that Congress intended to "grandfather-in" those pre-existing rate agreements subject only to two requirements: that the contract be lawful and in effect as of October 1, 1980. As noted earlier, the "exclusive remedy for any alleged breach of a contract entered into under this section shall be in an action in appropriate state court or United States District Court, unless the parties otherwise agree." 49 U.S.C.A. § 10713(i)(2).
 
 
 127
 We make these observations knowing that they are at odds with certain conclusions of the Commission which we believe represent an unwarranted extension of its power over rate agreements after the effective date of the Staggers Rail Act. Thus, in a policy statement issued by the ICC and furnished to us in connection with its supplemental brief,[27] the Commission has recognized Congress' intent, in enacting the Staggers Rail Act, to limit the power of the Commission to review freight rates established by contracts between shipper and carrier. Nonetheless, the Commission asserts that it retains jurisdiction to regulate rates arising from such agreements in existence at the effective date of the Act whether or not they were the subject of a pending proceeding before the ICC or federal appeals court.
 
 
 128
 The Commission's position seems to be founded on the observation that pre-existing agreements must be "lawful" and "in effect" on October 1, 1980, in order to be insulated from ICC review pursuant to section 208. It seems the Commission now claims that the determination of "lawfulness" is, in part, tied to the determination of "reasonableness" under the Interstate Commerce Act and, therefore, that the ICC has retained jurisdiction to review all pre-existing contract rates before they can be enforced in federal or state courts.
 
 
 129
 The difficulty with this position in our view is that it flies in the face of the express language of the statute and a clear congressional intent, discussed above, to allow parties to establish freight rates without further review by the ICC for the reasonableness of their contract rate. Section 208 allows only limited ICC review of contract rates, on grounds other than the traditional reasonableness criteria. Moreover, section 208 review proceeds on a more expedited time schedule than allowed for reasonableness determinations.[28] Our decision to uphold the ICC's jurisdiction over the rates at issue here is based on the fact that this rate dispute was pending on appeal at the time the Staggers Rail Act was enacted into law. However, contracts and rates therein that were in effect but were not under challenge before the ICC or the courts at the time the new statute came into force, and that are not before the ICC pursuant to section 229 of the Staggers Rail Act,[29] fall within section 208 of the new statute and are not subject to ICC reasonableness review.
 
 
 130
 While such comment may appear to be dicta in this context, we deem it necessary in view of our remand of the proceedings concerning the BN-CC rate dispute. The Commission also appears to imply that it has authority under subsection 10713(j) to entertain and decide questions concerning the existence and validity of contracts in terms of the common law of contracts. This is the first indication to this court that the Commission intended to undertake such a purely judicial task, and we are unable to find support in the Staggers Rail Act or prior law for it. Certainly, the Commission never before has claimed any expertise as to the existence and interpretation of contracts and has never claimed that it can enforce a contract between a shipper and carrier. Rather, the Commission has contented itself to consider proof regarding the existence and content of such agreements as merely evidence bearing on the reasonableness of rates being charged by a carrier. See ante at 573-574.
 
 
 131
 We thus conclude that on its face, section 208 evinces an unequivocal intention that matters of contract dispute between shipper and carrier are to be decided by courts of law rather than by the ICC, and that rates established by contract are to be enforced, if anywhere, in the courts without review under the Interstate Commerce Act by the ICC.
 
 
 132
 Where contract rates are, after final review, determined to have been in effect on the effective date of the Act, the question thereafter of their legality and of their continuing impact is a matter to be governed by contract law as applied by the appropriate state or federal district court and not by the Commission. The Conference Report accompanying the Staggers Rail Act states: "If a case is in Federal Court or has been remanded to the Commission, the Conferees intend that the rate ultimately determined by the Commission shall be considered the rate in effect on the date of enactment for the purposes of this Act." H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 142, reprinted in (1980) U.S. Code Cong. & Ad. News, 4110, 4174.
 
 
 133
 Assuming that our decision in the Minnesota Power & Light and Detroit Edison rate cases is final, these rates would be the rates in effect on the effective date of the Act. Likewise, with respect to the rates finally established in the petition of Cleveland Cliffs, those must of course await ultimate determination by the Commission upon remand and any further action by this court on any subsequent petition for review. Only after final action on this petition will the rate in effect on the effective date of the Staggers Rail Act be known.
 
 
 134
 At the same time, we hasten to make clear that the determinations of the Commission with respect to the reasonableness of these rates and, indeed, of our decision with respect to the validity of the ICC determinations, are not intended to indicate any final judgment as to the lawfulness or validity of the underlying agreements themselves. This case was not argued on the basis of contract law, nor could it have been since no action has been taken in a court of original jurisdiction. We have not decided any matters of a contractual nature. We have not endeavored to determine whether these agreements were, in fact, binding legal contracts, or whether perhaps under principles of equity, relief from these agreements might or might not be appropriate. These matters are to be decided, in the first instance if at all, in the several courts of the state or nation.
 
 Attachment A
 INTERSTATE COMMERCE COMMISSION
 EX PARTE NO. 358-F
 CHANGE OF POLICY, RAILROAD CONTRACT RATES
 Decided February 21, 1980
 Late Release Service Date Feb. 21, 1980
 
 135
 This statement is issued as a clarification and amplification of our prior statements served November 9, 1978 and April 10, 1979 in Ex Parte No. 358-F. In those prior statements, we expressed our view that rates established in contracts between rail carriers and shippers are not unlawful per se under the Interstate Commerce Act and that in certain circumstances such rates should be encouraged.
 
 
 136
 In several subsequent cases in which carriers proposed rate changes, however, we declined to consider claims by shippers that the change was in excess of previously executed contracts with the shippers.[1] Instead, we determined the reasonableness of the changes under ordinary standards and stated that disputes concerning the existence and legal significance of alleged contracts should be resolved by the courts. We also expressed the view that the alleged contracts in those cases were not legally binding because they were entered into before we issued our policy statement in Ex Parte No. 358-F. We have determined that reconsideration of our treatment of alleged contracts in those cases, which are currently pending before the Commission on petitions for administrative review, is warranted.
 
 
 137
 In order to implement our views in Ex Parte No. 358-F, we have concluded that it is appropriate, in cases in which rate changes are proposed, for the Commission to consider claims by shippers that the rate change is in excess of a contract between the carrier and the shipper. We believe that it may also be appropriate in some cases in which we find the shippers' claims to have merit, to suspend the rate change and/or ultimately to find that the filing of the change is unreasonable and unlawful and to prescribe a rate that conforms to the contract.
 
 
 138
 Our conclusions are based on both legal and policy considerations. As a legal matter, in cases in which a carrier files a rate change that is approved by the Commission but that is in violation of the carrier's contract with a shipper, we believe that courts are without legal authority to provide shippers with a meaningful remedy for the breach of contract. Thus, it is well settled that courts may not award damages to shippers that would have the effect of reducing their transportation charges below the rate on file with the Commission. See, e. g., Montana-Dakota Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, (71 S.Ct. 692, 695, 95 L.Ed. 912) (1951); Georgia v. Pennsylvania R. Co., 324 U.S. 439, 453 (65 S.Ct. 716, 724, 89 L.Ed. 1051) (1945); Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520 (59 S.Ct. 612, 614, 83 L.Ed. 953) (1939); Farley Terminal Co., Inc. v. Atchison, T. & S. F. Ry. Co., 522 F.2d 1095, 1098 (9th Cir. 1975). It is also well established that a court has no power to suspend or enjoin the effectiveness of a rate on file with the Commission. See, e. g., (Southern Ry. Co. v.) Seaboard Allied Milling Corp. v. Southern Ry. Co. (442 U.S. 444), 99 S.Ct. 2388 (60 L.Ed.2d 1017) (1979); United States v. SCRAP, 412 U.S. 669 (93 S.Ct. 2405, 37 L.Ed.2d 254) (1973); Arrow Transportation Co. v. Southern Ry., 372 U.S. 658 (83 S.Ct. 984, 10 L.Ed.2d 52) (1963). The principle of those cases would also preclude courts from ordering a carrier to file a superceding tariff with the Commission in accordance with its contract because such an order would have the same effect as suspending a rate on file with the Commission. In light of these authorities, the Commission has concluded that if it declines to give any consideration to contracts between shippers and carriers when assessing the reasonableness of a rate increase, shippers would be without an effective remedy and the result would significantly undermine the Commission's policy in Ex Parte No. 358-F.
 
 
 139
 The foregoing legal considerations are reinforced by considerations of sound regulatory and transportation policy. Consideration of the weight to be given to contracts by the Commission rather than by many different federal and state courts will ensure national uniformity in the standards to be applied to rate matters, which is a fundamental purpose of the Interstate Commerce Act. See United States v. Radio Corporation of America, 358 U.S. 334, 346-348 (79 S.Ct. 457, 464-465, 3 L.Ed.2d 354) (1959); Texas and Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 440 (27 S.Ct. 350, 355, 51 L.Ed. 553) (1907). Such consideration by the Commission facilitates implementation of federal transportation and regulatory policies in a consistent manner.
 
 
 140
 Accordingly, the Commission will now consider rate contract allegations when raised in Commission proceedings. In regard to contracts entered into after issuance of the Commission's November 9, 1978 policy statement in Ex Parte No. 358-F, we will view the existence of such a contract as creating a presumption that a proposed rate change in excess of the contract rate is unreasonable in violation of the Interstate Commerce Act. However, there may be unusual and compelling circumstances which would rebut this presumption and warrant our upholding a rate change in excess of a contract rate. For example, the Commission might determine that a contract rate should not be enforced if it failed to contribute to the going concern value of the carrier as required by 49 U.S.C. 10701(b) or is likely to imperil the carrier's ability to provide essential rail service to the public. Cf. FPC v. Sierra Pacific Power Co., 350 U.S. 348, 355 (76 S.Ct. 368, 372, 100 L.Ed. 388) (1956).
 
 
 141
 The Commission intends shortly to institute a rulemaking that will propose several specific substantive and procedural requirements for contract rates and will propose to define more precisely the types of circumstances that might warrant Commission approval of a rate change that departs from the one agreed to in a valid contract. In the meantime, pending more specific rules, carriers and shippers should assume that the Commission will give recognition to contractual agreements concerning rates, in the absence of compelling circumstances indicating that enforcement of the agreed rate would be detrimental to the public interest.
 
 
 142
 The Commission has further concluded that the fact that particular agreements were negotiated prior to the issuance of its 1978 Ex Parte No. 358-F policy statement, is not an appropriate reason for giving them no consideration. It is true that the lawfulness of such contracts was somewhat uncertain when the parties entered into them, although in our 1978 policy statement we concluded that they had never been unlawful per se. In any event, as we noted in the subsequently decided cases (see note 1, supra), permitting a carrier to file rate increases in excess of its contract with a shipper may often result in substantial hardship and unfairness to the shipper, particularly if the shipper made substantial capital expenditures in reasonable reliance on the agreed upon rates. Accordingly, the Commission will consider whether, or to what extent, to enforce such pre-Ex Parte 358-F contracts on a case-by-case basis in determining whether a proposed rate increase is unreasonable under the Act. Such alleged contracts will be considered and will be given great weight if the shipper demonstrates (1) that the parties intended to be legally bound by the agreement; (2) that the shipper reasonably relied on the contract to its substantial detriment (e. g. by making large capital investments that it would not otherwise have made); and (3) that public interest considerations warrant holding the carrier to the agreement. In sum, with respect to agreements entered into before our 1978 policy statement, the Commission will weigh the alleged agreement, together with all other factors bearing on the reasonableness of the proposed rate. Consideration of these factors may lead us to prescribe or approve a rate within a range from the contract rate to the maximum reasonable rate that would apply in the absence of a contract.
 
 
 143
 By the Commission, Chairman Gaskins, Vice Chairman Gresham, Commissioners Stafford, Clapp, Trantum, and Alexis.
 
 
 144
 Commissioner Alexis was absent and did not participate.
 
 AGATHA L. MERGENOVICH
 Secretary
 
 145
 (SEAL)
 
 
 
 [1]
 Burlington Northern filed three separate petitions for review, all stemming from the ICC's decision finding the proposed rate increases to be unreasonable and setting the maximum reasonable rate. These petitions were filed sequentially and assigned docket numbers 79-3777, 80-3020 and 80-3161. Cleveland Cliffs filed two separate petitions for review, Nos. 79-3775 and 80-3159. All petitions were consolidated by order of this court on April 3, 1980. Both Detroit Edison and Minnesota Power & Light submitted briefs as intervenors in support of the ICC and United States of America and in opposition to Burlington Northern in consolidated cases Nos. 70-3777, 80-3020, and 80-3161. In addition, Burlington Northern submitted a brief as an intervenor in Nos. 79-3775 and 80-3159, responding to the brief of petitioner Cleveland Cliffs. Likewise, Cleveland Cliffs submitted a brief as an intervenor in Nos. 79-3777, 80-3020 and 80-3161, responding to the brief of petitioner Burlington Northern
 
 
 [2]
 Apart from these contractual commitments to western coal suppliers, the shippers also made substantial investments in electric generating equipment designed to burn western coal and facilities for receiving and handling the coal shipments. For example, DE acquired and paid for support facilities including a fleet of 600 rail cars, large lake vessels, coal dock and transfer facilities and generating facilities totaling approximately $500 million. CC entered into a 15-year agreement with Midwest Energy Resources Company for use of the Ortron facility at Superior
 
 
 [3]
 One such "gross inequity" clause stated:
 It is the intent of BN and the shipper that the formula described above will compensate BN for any changes in the cost of transporting the shipper's coal tonnages above the ... base index level. If either party should suffer a gross inequity as a result of the formula failing to fairly reflect cost changes, such inequities will be resolved by mutual agreement between BN and the shipper. Pending such agreement, neither party shall be relieved of its obligation as outlined in the current effective tariff and regular escalation shall continue using the above formula.
 
 
 [4]
 Under section 202 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31, ("the 4R Act"), the ICC cannot declare a rate to be unjust or unreasonable unless it first finds that the carrier proposing the rate has "market dominance" over the service to which the proposed rate applies. 49 U.S.C. § 10709(b) (1979 Supp. III). "Market dominance" is defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10709(a) (1979 Supp. III)
 BN has not challenged the Commission's finding of market dominance. The BN lines involved generally originate in Montana and extend across North Dakota and Minnesota with different spurs connecting the main line with the several coal companies in Montana and the points of delivery for the three shippers.
 MPL receives its coal from Peabody Coal Company's Big Sky Mine near Colstrip, Montana, pursuant to a 25-year coal supply contract due to expire in 1993. From this point BN transports the coal to Cohasset, Minnesota. BN is the only rail carrier serving both Colstrip and Cohasset.
 DE receives coal from the Decker Coal Company's mine located near Colstrip, Montana, pursuant to a 26-year coal supply contract due to expire in 2001. From Colstrip, BN ships the coal to Superior, Wisconsin, where it is loaded onto lake barges for movement through Lake Superior and Lake Huron and eventual delivery to St. Clair in southeastern Michigan. BN is the rail carrier for this line.
 CC receives its coal from three different sources located in Montana. In 1977 CC entered into 6-year coal supply contracts with DE, Western Energy Company and Westmoreland Resources, each due to expire in 1983. BN transports coal from Decker, Colstrip and Kuehn to Superior, Wisconsin, where it is loaded onto lake barges and shipped to Marquette, Michigan. BN is the sole rail carrier for this line.
 
 
 [5]
 ICC Ex Parte No. 358-F, "Change of Policy-Railroad Contract Rates" (decided February 21, 1980)
 
 
 [6]
 We recognize that the practice followed here is subject to some criticism. The December 26 decision, although subject to a petition for review, would have been particularly difficult to challenge if the petitioner had been limited to the findings of the Commission made at that time. However, this potential disadvantage was avoided by the Commission's relatively prompt explanation of its December 26 decision, issued less than three months later
 
 
 [7]
 Prior to the policy statement, there was some confusion surrounding the legality of private rate agreements and the weight to be accorded such agreements vis-a-vis the ICC's statutory responsibility under the Interstate Commerce Act to determine the reasonableness of rates for rail transportation
 
 
 [8]
 A similar argument was made by BN and rejected by the court in Iowa Power & Light Co. v. Burlington Northern, Inc., 647 F.2d 796 (8th Cir. 1981). We agree, however, with the conclusion of the Eighth Circuit that, at least in the absence of any secret or preferential private agreement raising other implications violative of the Interstate Commerce Act, the Commission's consideration of such agreements as evidence bearing on the reasonableness of rates was not erroneous as a matter of law
 BN also claims that certain 1979 ICC decisions indicated that contract rates would be accorded no weight in rate reasonableness determinations. See Annual Volume Rates on Coal-Wyoming to Flint Creek, Arkansas, No. 36970 (served May 25, 1979); Unit Train Rates on Coal-Burlington Northern, Inc., 361 I.C.C. 688 (1979). However, neither BN's nor the shippers' intent to be bound by their agreements could depend on those decisions since their agreements pre-dated three ICC decisions.
 
 
 [9]
 We need not decide here the effect of the policy upon private agreements entered into after November 9, 1978, or the creation therein of presumptions of unreasonableness with respect to freight rates that do not conform to the contract rate. We note that according to the policy statement of February 21, 1980, the Commission intended to institute rule-making proceedings which would propose substantive and procedural requirements for contract rates. Those rules are, of course, not before us here. See Ex Parte No. 358-F, supra, Attachment A at p. 594
 
 
 [10]
 As discussed below, while we are of the opinion that it was entirely proper for the ICC to scrutinize each BN-shipper rate agreement under the contract rates policy, we are obliged to conclude that with respect to the rates approved for CC's Colstrip and Kuehn movements, the plain language of the ICC's March 10 decision indicates that the Commission failed to follow its own policy and apparently, for all practical purposes, accorded conclusive binding effect to the agreement
 
 
 [11]
 See Unit Train Rates on Coal-Burlington Northern, Inc., I & S No. 9199, (decided September 29, 1980). There again, the ICC had under consideration an understanding between BN and a shipper. In deciding whether to prescribe the rate when applying its contract rates policy, the ICC articulated several factors that were included in its "public interest" element of this new policy. It stated:
 A final public interest consideration is whether enforcement of the base rate and escalation formula in the BN-IP&L agreement will ... otherwise contravene Commission standards for determining rate reasonableness.
 The cost evidence indicates that enforcement of this agreement will not result in a gross inequity to either BN or IP&L and will be in general harmony with Commission standards in determining the reasonableness of rates where rate agreements are not in issue.
 Id. at 193-94 (emphasis added).
 
 
 [12]
 BN made this argument in conjunction with its claim that the ICC merely enforced the alleged agreements between BN and the three shippers. We have already disposed of this question, see ante at 8-9, and we now deal with the broader question of the ICC's statutory rate-making duties
 
 
 [13]
 For the MPL unit-train coal movement, the ICC found the fully allocated cost to be $6.68 per ton. The rate established under the BN-MPL agreement, as increased pursuant to the built-in escalation formula, was $6.76 per ton (minimum annual volume of 1.75 million tons) or $7.14 per ton (minimum annual volume of 1.5 million tons). For the DE unit-train coal movement, the ICC found the fully allocated cost to be $7.24 per ton. The rate established under the BN-DE agreement, as increased pursuant to the built-in escalation formula, was $7.45 per ton
 
 
 [14]
 The Commission found that BN's proposed rate increases "to be completely unwarranted" based on the Commission's restatement of costs. Yet, BN's proposed increase ($11.23 per ton) was not much higher than the agreed rate eventually adopted by the Commission ($10.03 per ton) which, in turn, appears to be completely unwarranted in light of the cost evidence ($6.30 and $6.16 per ton respectively for the Kuehn and Colstrip unit-train coal movements). We also note in passing that BN's proposed rate increases for the BN-MPL and BN-DE unit-train coal movements ($10.43 per ton and $10.15 per ton respectively) were found to be unlawful by the Commission. Yet, both of these increases approximate $10.03 per ton rate approved for CC. Furthermore, the fully allocated cost of service on the BN-CC line was noticeably lower than the fully allocated costs for the BN-MPL and BN-DE line movements
 
 
 [15]
 In its February 21, 1980 contract rates policy statement, the ICC expressly stated:
 In sum, with respect to agreements entered into before our 1978 policy statement, the Commission will weigh the alleged agreement, together with all other factors bearing on the reasonableness of the proposed rate. Consideration of these factors may lead us to prescribe or approve a rate within a range from the contract rate to the maximum reasonable rate that would apply in the absence of a contract.
 Ex Parte No. 358-F, supra, Attachment A at p. 594. Although this language is somewhat ambiguous and could be construed to be consistent with the ICC's action here, we do not believe that ICC or judicial precedent would permit the Commission to use its contract rates policy in such a manner as to prescribe a contract rate that is far above the maximum reasonable rate absent the agreement. This might conflict with prior cases holding that private parties cannot themselves set an unreasonable rate. See e. g., Unit Train Rates, I & S No. 9199, supra.
 In its brief, the ICC contends that it properly upheld the BN-CC agreement rate because "the uniformity and evenhanded application of the policy is as important as the policy itself. If the Commission did not apply its contract rate policy even-handedly, it would be subject to a charge of patent arbitrariness." ICC Brief at 50. Furthermore, it argued that "(t)he Commission properly declined to substitute its business judgment for that of the shipper." ICC Brief at 51.
 These arguments miss the point. Surely the ICC was duty bound to scrutinize each of the BN-shipper agreements under its contract rates policy. Yet, the process of applying the policy does not require the ICC to adopt the agreed rate in each instance. The point is that substantial rate differences did exist under the agreements despite a similarity of costs; this led the ICC to conclude that the BN-CC rate should have been lower absent the agreement. The "evenhanded" adherence to the contract rate in each case actually resulted in unequal treatment. The fact that the ICC should not substitute its "business judgment" for that of the parties does not relieve it of its obligation to make an independent review of rate reasonableness. See e. g., Unit Train Rates, I & S No. 9199, supra, and discussion n. 11 supra. To argue otherwise would make a nullity of the regulatory scheme under the Interstate Commerce Act.
 
 
 [16]
 Rail Form A (Statement IFI-73) "Formula for Use in Determining Rail Freight Service Costs" (1973)
 
 
 [17]
 In this case, Rail Form A included system-wide investments as of 1977 indexed to reflect cost levels at the beginning of 1979
 
 
 [18]
 In Annual Volume Rates, Wyoming to Flint Creek, supra, at 541, the ICC states:
 If the railroads included the cost of these investments in their Rail Form A inputs, a share of these extraordinary costs would be allocated to all shippers. While we recognize that these investments will allow faster speeds for other traffic, other shippers do not require, nor have they asked for, this level of service. It would be unfair to present them with a share of the bill.
 Similarly, in Arkansas Power & Light Co. v. Burlington Northern, Inc., 361 I.C.C. 504, 508 (1979), the ICC observed:
 Finally, we cannot agree with complainants that incremental investment costs should be reduced because some noncoal traffic will take advantage of the fixed plant investment allocated exclusively to coal traffic. We are convinced that the additional investment would not have been made but for unit-train coal service. Therefore, it would be unfair to include these costs in Rail Form A to be spread among all traffic which does not require the upgraded track structure necessary for coal traffic.
 
 
 [19]
 Cf. San Antonio, supra, 631 F.2d at 839-41 (locomotive fuel and maintenance costs properly calculated despite prior ICC decisions employing a different methodology)
 
 
 [20]
 We are frank to acknowledge that the ICC's approach described above is not entirely clear and that we have some difficulty in understanding the Commission's explanation. In particular, we find no clear discussion of its decision to include both leased and purchased locomotives in the capital cost calculation. This deficiency should be capable of correction upon remand. The Commission should explain whether there are, or should be, different rates of return for those locomotive units which BN actually purchased vis-a-vis those units which BN leased. Moreover, it is not clear whether the length of the lease agreements should make a difference in categorizing the leased equipment as a cost of capital rather than as an operating expense
 
 
 [21]
 Section 10701(b)(2)(B) states:
 Variable and incremental costs shall be determined under formulas prescribed by the Commission. However, when making a determination of variable costs, the Commission shall, on application of the rail carrier proposing the rate, determine only the costs of that carrier and only those costs of the specific service in question unless the specific information is not available. The Commission may not include in variable costs an expense that does not vary directly with the level of transportation provided under the proposed rate.
 49 U.S.C. § 10701(b)(2) (1979 Supp. III).
 
 
 [22]
 Locomotive unit costs and maintenance calculations were discussed in several separate sections of the ICC opinion. See 362 I.C.C. at 663-65 (origin and destination switching costs); 362 I.C.C. at 669-70 (gross ton-mile costs); 362 I.C.C. at 670 (locomotive unit-mile costs)
 
 
 [23]
 The court stated:
 (T)he Commission asserted that before it would impose a "substantial burden on some shippers," the railroads would be required to submit data on the following:
 (1) specific identification of the traffic that must be subsidized by other traffic and the reason why rates cannot be increased on that traffic;
 (2) the extent to which the railroads provide service on unprofitable branch lines and the reason(s) why such service cannot be made profitable or abandoned;
 (3) identification of commodities other than coal which could also make substantial contributions to the railroads' system revenue needs; and
 (4) identification and quantification of excess capacity on a carrier's system.
 San Antonio, supra, 631 F.2d at 850-51 (quoting from San Antonio, Texas v. Burlington Northern, Inc., 361 I.C.C. 482, 496 (1979)).
 
 
 [24]
 Under section 208, contracts setting rates for transportation of non-agricultural products may be reviewed by the ICC only to determine if (1) the contract unduly impairs the common carrier obligations of the contracting railroad to a non-contracting shipper or (2) the contract results in an unreasonable discrimination against a port. Contracts establishing rates for the transportation of agricultural commodities can be reviewed upon the grounds listed above and also to determine if the contract either discriminates against another shipper or constitutes a destructive competitive practice. See Pub.L. No. 96-448, § 208, 49 U.S.C.A. § 10713(d)
 
 
 [25]
 The Conference Report to the Staggers Rail Act discusses the purpose behind section 208 in no uncertain terms:
 The provision (section 208) establishes a separate class of rail service and thereby makes carriers entering into such contracts both common carriers and contract carriers. Once a contract is approved by the Commission or goes into effect because the Commission has not acted within the specified time limits, the service provided under the contract is exempt, ... from all regulation and all of the requirements of the Interstate Commerce Act.... Once contracts are approved under this section, they are to be enforced in the courts and not at the Commission.
 H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100, reprinted in (1980) U.S. Code Cong. & Ad. News 3978, 4110, 4132 (emphasis added).
 
 
 [26]
 In reaching this decision, we note that with section 229 of the Staggers Rail Act, Congress provided a mechanism for challenging any rate in effect at the time the Act came into force
 SAVINGS PROVISIONS
 Sec. 229. (a) Any rate that is in effect on the effective date of this Act for transportation by a rail-carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of title 49, United States Code, may, during the 180-day period beginning on such effective date, be challenged in a complaint filed with the Interstate Commerce Commission by any interested party alleging that the rail carrier has market dominance over the transportation to which the rate applies, as determined under section 10709 of such title, and that the rate is not reasonable under section 10701a of such title.
 (b) Any rate described in subsection (a) of this section-
 (1) which is not challenged in a complaint filed within the 180-day period provided in such subsection; or
 (2) which is challenged in such a complaint, but (A) the rail carrier is found not to have market dominance over the transportation to which the rate applies, or (B) the rate is found to be reasonable,
 shall be deemed to be lawful and may not thereafter be challenged in the Commission or in any court (other than on appeal from a decision of the Commission).
 (c) The provisions of this section shall not apply to any rate under which the volume of traffic moved during the 12-month period immediately preceding the effective date of this Act did not exceed 500 net tons and has increased tenfold within the 3-year period immediately preceding the bringing of a challenge to the reasonableness of such rate.
 (d) The burden of proof in any proceeding under this section shall be on the complainant.
 There is no indication that the Commission, in deciding cases brought pursuant to section 229, was to make a rate reasonableness determination under the new statutory scheme. In fact, the Conference Report stated: "The purpose of this provision is to give affected parties a final opportunity to review the reasonableness of existing rates before their opportunity to challenge those rates is curtailed." H.Conf.Rep. No. 96-1430, 96th Cong., 2d Sess. 121, reprinted in (1980) U.S. Code Cong. & Ad. News 4110, 4153. In light of this congressionally afforded opportunity for review of rates after October 1, 1980, we believe that this petition for review, as well as the appeal in the companion case, see The Hanna Mining Co. v. The Escanaba and Lake Superior Railroad Co., 664 F.2d 594, No. 80-1681 (both cases having been decided initially before Congress enacted the Staggers Rail Act) should be reviewed according to the law as it existed prior to October 1, 1980. Otherwise, we would have the rather anomalous result that parties challenging rates within 180 days after the new law was in effect would have an opportunity for review under the prior law while parties who had cases pending or completed at the Commission would be subject to the new statutory scheme. If the new law were applied in CC's case, as suggested by BN, the shipper would be precluded from taking advantage of a congressionally conferred opportunity (possibly without further recourse) because of the timing of this court's decision.
 
 
 [27]
 See ICC, "Interpretive Statement-Contract Rates" (decided November 5, 1980)
 
 
 [28]
 Section 207 of the Staggers Rail Act allows the Commission a maximum of eight months for investigating and determining the reasonableness of rates filed with the ICC by a railroad acting as a common carrier. Section 208 only allows the Commission 30 days to complete an investigation of contract rates filed with the ICC. See Pub.L. No. 96-488, §§ 207, 208, 49 U.S.C.A. §§ 10707(b), 10713(d)(3)(A)
 
 
 [29]
 See n.26 supra
 
 
 [1]
 Docket No. 36970, Annual Volume Rates on Coal-Wyoming to Flint Creek, Arkansas and consolidated cases (decisions served May 3, 1979 and May 25, 1979); and Docket No. I & S 9199, Unit Train Rates on Coal-Burlington Northern, Inc., and consolidated cases (decision served July 13, 1979)